**COLORADO DEPARTMENT OF LABOR AND EMPLOYMENT,**
**Petitioner,**

v.

**UNITED STATES DEPARTMENT OF LABOR, Respondent.**

**No. 87–1736.**

United States Court of Appeals,
Tenth Circuit.

May 23, 1989.

Michael J. Steiner, Asst. Atty. Gen., Human Resources Section (Duane Woodward, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., and Richard H. Forman, Sol. Gen., with him on the briefs), Denver, Colo., for petitioner.

Vincent C. Costantino (George R. Salem, Sol. of Labor, Charles D. Raymond, Associate Sol. for Employment and Training, and Robert J. Lesnick, Acting Counsel for Litigation, with him on the brief), U.S. Dept. of Labor, Office of the Sol., Washington, D.C., for respondent.

Before LOGAN, McWILLIAMS and ANDERSON, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

This dispute between a federal and a state agency concerns Colorado's expenditure of federal monies under the Comprehensive Employment and Training Act of 1973 ("CETA"), as amended, 29 U.S.C. § 801, *et seq.* (repealed 1982). The Colorado Department of Labor and Employment ("Colorado") was the "prime sponsor" of the state's CETA programs and received CETA funds for a variety of state initiated job training and public employment programs. The federal funds were to be expended in accordance with rules and regulations promulgated by the Department of Labor ("DOL"). A routine audit of fourteen CETA grants, performed for the period October 1, 1980 through September 30, 1982, questioned certain costs and recommended the disallowance of others, together totalling $628,007. The appropriate DOL Grant Officer adopted most of the audit findings and issued a Final Determination disallowing Colorado's expenditure of $563,271 of CETA funds. Through subsequent negotiations between the parties, the disallowance was reduced to $405,659, leaving four findings of the Grant Officer still in dispute.

The four separate disallowances at stake here involve the following amounts: (1) $126,763 (finding #7), (2) $4,973 (finding #1), (3) $234,861 (finding #2), and (4) $39,-062 (finding #18). The first amount reflects Colorado's alleged failure to properly document $126,763 of expenditures in its financial status reports. The second disallowance is the amount of an unauthorized cost overrun of $4,973 that allegedly had been covered by the federal government. The third, of $234,861, was for an alleged violation of 20 C.F.R. § 676.16(c)(1)(v), i.e., for exceeding specified budget ceilings by more than fifteen percent without prior approval. Finally, the fourth, of $39,062, was for failing to request prior approval

from the regional administrator or grant officer for each purchase by a subrecipient of video equipment exceeding $500 per unit.

Colorado appealed the $405,659 disallowance to DOL's Office of Administrative Law Judges on November 4, 1984. A hearing was held on December 12, 1986, and on February 12, 1987 an administrative law judge ("ALJ") affirmed the decision of the Grant Officer and ordered the state to pay DOL the $405,659. Colorado appealed this decision to the Secretary of Labor, who exercised his regulatory authority to decline to review it. *See* 20 C.F.R. 676.91(f). The decision of the ALJ became the final decision, and Colorado filed a petition for review with this court, as authorized by section 107 of CETA, 29 U.S.C. § 817.[1] We affirm the decision of the ALJ with respect to all four findings.

## I.

Dispute over the $126,763 disallowance figure centers on record-keeping. DOL regulations required that a grantee maintain records that adequately identify the source and application of funds. 20 C.F.R. § 676.34(a); 41 C.F.R. § 29–70.207–2(b)(c) and (g). The federal auditors reported that Colorado worksheets supporting its financial status reports ("FSRs") identified numerous amounts only as "adjustments" without back-up materials documenting the adjustments. In addition, Colorado could not support unadjusted amounts listed on these worksheets for certain subrecipients. Complainant's Ex. C–4 at 18 (hereinafter cited as "Audit Report"). Armando Quiroz, the DOL Grant Officer who reviewed the Audit Report, ultimately determined that Colorado could not document some $126,763 out of $366,515 in questionable costs. The Audit Supervisor of Colorado's Office of Rural Job Training, Judy Wagner, who was responsible for presenting Colorado's position at the DOL hearing, testified that because of the general nature of the auditors' findings and the lack of

specificity as to which particular contracts lacked documentation and during what time period, Colorado could not determine what documentation was missing and, therefore, could not retrieve it. In other words, Colorado argued at the hearing that although it was told that it had supplied inadequate documentation, it was not told what documentation it needed to supply. The ALJ ruled that this did not excuse Colorado from keeping proper documentation in the first place and that it "had not met its burden of showing that these cost adjustments were proper, or that their financial management system was adequate." Decision and Order of February 12, 1987 at 5.

■ Before this court, Colorado reiterates its argument that it was denied proper notice of its failings. We agree with the ALJ that this argument masks the underlying fact that CETA regulations placed on grant recipients the responsibility of establishing, maintaining, and demonstrating an adequate accounting and financial management system in the first place. *See* 20 C.F.R. § 676.34(a) and 41 C.F.R. § 29–70.207–2(b)(c) & (g). *See also Montgomery County, Md. v. Dept. of Labor*, 757 F.2d 1510, 1513 (4th Cir.1985); *City of Oakland v. Donovan*, 703 F.2d 1104, 1107, *modified*, 707 F.2d 1013 (9th Cir.1983). Additionally, and as the ALJ properly observed, CETA regulations placed on the party requesting the hearing the burden of establishing compliance with the CETA Act and regulations and its entitlement to the relief requested. 20 C.F.R. § 676.90(b). *See Quechan Indian Tribe v. United States Dept. of Labor*, 723 F.2d 733, 735 (9th Cir.1984); *Maine v. United States Dept. of Labor*, 669 F.2d 827, 829 (1st Cir.1982).

■ The original amount of questionable costs from unsupported worksheet figures amounted to $366,515. The schedule at page 111 of the Audit Report breaks out the questionable costs by grant number and then gives the cost category within

---

1. CETA has been replaced by the Job Training Partnership Act ("JTPA"), 29 U.S.C. § 1501, *et seq.* Cases commenced prior to September 30, 1984 continue to be adjudicated under CETA. Section 181(e) of JTPA, 29 U.S.C. § 1591(e).

each grant, the amount of the questionable costs in that category, and the same description of the costs as that given on the Colorado worksheets. Audit Report at 111. Therefore, any vagueness in the description can be attributed to Colorado, not to the auditors. The original figure eventually was reduced to the current $126,763 after a subsequent, phase-down audit inadvertently found relevant documentation supporting some of the costs originally questioned. DOL Hearing at 56.

The factual findings of the Secretary with respect to misspent funds are conclusive if supported by substantial evidence. Section 107(b) of CETA, 29 U.S.C. § 817(b). We conclude that the relevant findings and conclusions in the Audit Report constitute substantial evidence of Colorado's failure to maintain adequate control over its record-keeping systems. In effect, they establish a prima facie case against Colorado, and the ALJ was correct in then placing the burden of persuasion on Colorado to show that the $126,763 in questionable costs should have been allowed by DOL, a burden it was unable to meet. *See Maine v. United States Dept. of Labor,* 669 F.2d at 829.

## II.

■ With respect to the $4,973 cost overrun, Quiroz testified before the ALJ that auditors find a cost overrun when costs actually spent by a grantee exceed the federally authorized budget amounts for a given program. Quiroz expressed his understanding that Schedule B–4 of the Audit Report, which showed a cost overrun of $4,973, was evidence of an actual overpayment by the federal government to Colorado. Wagner, in contrast, insisted that Colorado had not sought reimbursement for the cost overrun and, therefore, should not have been required to repay funds it had never received. The ALJ accepted Quiroz' view that the auditors would not have recommended disallowance of the $4,973 had not the federal government already disbursed it.

As noted in Section I, the factual findings of the Secretary with respect to misspent funds are conclusive if supported by substantial evidence. The possibility of reaching two different conclusions from the evidence does not prevent an administrative agency's findings from meeting the substantial evidence test. *Consolo v. Fed. Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); *Curtis, Inc. v. I.C.C.,* 662 F.2d 680, 685 (10th Cir.1981).

The best source of evidence as to the $4,973 cost overrun is the Audit Report itself, supplemented by interpretation of the Report provided by both Wagner and Quiroz. The cost overrun in question is with respect to grant # 08–1–155–32, a summer youth employment program. Audit Report at 8; DOL Hearing at 36. As reported in Schedule B–4 of the Audit Report, federal funds "authorized" for the period October 1, 1980 through September 30, 1981 for this grant amounted to $1,444,542. Audit Report at 69. "Costs reported" by Colorado were $1,440,469, i.e., within the amount authorized. The auditors, however, after reviewing the financial worksheets for the grant, made "audit adjustments," reflecting the auditors' best judgment of actual costs. The calculation of the actual costs, i.e., "audited costs," produced a total figure of $1,449,515, an increase of $9,046 in costs attributed to the grant and creating costs of $4,973 in excess of the amount authorized. *Id.* In other words, the auditors judged that actual costs spent under the grant had been higher than those reported. Nonetheless, on its face, Schedule B–4 does not show that the actual costs had been reimbursed by the federal government.

Colorado asserts that, regardless of a cost overrun, it never *reported* more than $1,440,469 as costs to be paid by the federal government. Wagner testified that Colorado "at no time submitted any kind of a revised close-out document with regards to this grant. We never asked for reimbursement of the costs that the auditors claimed to be attributable to this grant. I don't think it's appropriate that [Colorado] be required to refund costs that we never received." DOL Hearing at 37. Later on

in her testimony, she reiterated the point by stating that "we never amended our financial status reports to reflect the increase in total cost to the grant that the auditors claim. So we never reflected the total $9,046. Therefore, we never reflected the $4,973 that was disallowed." *Id.* at 43. Finally, Ms. Wagner explained the above statements by saying:

"In order to make those statements, I have to be extremely certain about the FSRs, the financial status reports, and it turns out that the original ones [were] submitted by a predecessor ... when it [sic] was due in '82 and then the final one sometime during the course of '83 when things were settled up. The audit wasn't finished until October of '83, and the reformatted report did not come out until well after March of 1984.... At that point I was performing the functions of fiscal officer and I have not ever submitted a revised financial status report based on this report. And the office would not have submitted one if I had not prepared it."

*Id.* at 45.

Quiroz' testimony on the same point was as follows:

"To the best of my knowledge, an auditor—and I refer [defer?] to the expertise of other witnesses—an auditor makes [audit] adjustments when he sees evidence of costs that were not previously reported. Sees evidence that some items were *reimbursed* ... so he adds those and then he arrives at a total cost."

*Id.* at 74 (emphasis added).[2] The DOL attorney questioned Quiroz thusly:

"Q: So these audit adjustments then were monies that were actually spent and already charged to the government or to the grant. Is that what your testimony is?
A: It was my understanding that that was the case.
Q: And if that's the case, that these were actual expenses, costs already charged to the government, then Colorado ... would have received those funds.

A: Yes.
Q: Okay. Would have received the amounts that were disallowed.
A: That's what the auditors were saying. That they had received those dollars.
Q: And you've seen no evidence to the contrary.
A: Well, I've heard a different position raised this morning, but prior to that, no."

*Id.* at 76.

Upon cross-examination, the following colloquy occurred:

"Q: And how was [the $9,046 amount reflected in the audit adjustments] paid?
A: ... [Colorado] has a letter of credit and draws down as a result of that letter of credit. I would imagine that was the procedure at the time also. I can't be sure of that. I was not the grant officer at that time.
Q: How do you know that the difference between auditing costs [audited costs] and the cost recorded [cost reported] ... was paid by the Department of Labor to [Colorado]?
A: It's stated in this report. The auditors' report. That particular column [referring to the audited costs column of Schedule B–4]. This is what the auditors' attesting to.
Q: Do you have any documents or do you know of any documents that shows that [Colorado] specifically asked for the difference between the audit costs and the costs reported?
A: That [Colorado] requested that from the federal government you mean?
Q: Yes.
A: No, I have no evidence that they did."

*Id.* at 78–79.

On the basis of the two divergent testimonies, the ALJ chose to accept Quiroz' view that the cost overrun had been paid by the federal government. While Schedule B–4 does not explicitly confirm Quiroz' view, indirect support that reimbursement

---

**2.** The only witnesses testifying at the hearing on this point were Wagner and Quiroz, so Quiroz' invitation to utilize the "expertise of other witnesses" created only limited possibilities.

had occurred comes from Schedule A and some of the conclusions of the Audit Report. Schedule A reports on the status of federal funds for the period from October 1, 1980 through September 30, 1982. It shows letter of credit drawdowns up through May 27, 1983 (after the end of the grant period) "rather than grant revenue per books since [Colorado's] records did not accumulate receipts by grant. . . ." Audit Report at 62. Yet the auditors also concluded that Colorado "did not maintain financial records which adequately identified . . . letter of credit drawdowns against the grants subsequent to the end of the grant period." *Id.* at 19. Although Schedule A reports $1,440,469 as the amount of Colorado's drawdowns through May 27, 1983 for the grant in question, # 08–1–155–32, nonetheless it also reports disbursements under the grant at $1,449,515, allowing the inference that federal monies from some CETA source had been spent to cover the cost overrun. *See Id.*

On the basis of the Audit Report findings, and the ALJ's determination that Quiroz' testimony was more credible than Wagner's, we conclude that substantial, if somewhat inconclusive, evidence supports the ALJ's decision that the federal government had reimbursed Colorado for its cost overrun. Colorado was unable to meet its burden to establish DOL error, and we uphold the ALJ's finding on this point.

### III.

■ The dispute over the third disallowance figure of $234,861 centers on whether Colorado was required to report budgetary shifts exceeding fifteen percent of the budget for each of three annual plan subparts, and is a matter of regulatory interpretation. Each year Colorado was required to submit an Annual Plan for providing program activities and services to the eligible population. *See* 20 C.F.R. § 676.9(a)(2). Among other things, the Annual Plan was to describe Annual Plan "subparts." *See* 20 C.F.R. § 676.11. Both DOL and Colorado agreed that a subpart designates a CETA grant funded by title designation, e.g., Title II B–C, Title II D, Title Vii, Title IV–Summer Youth Employment Program, Title IV–Youth Community Conservation and Improvement Projects, etc. *See* Section 676.11(c)(6). The CETA regulations required that certain kinds of modifications to the Annual Plan receive prior approval, including "[f]or Annual Plan subparts of over $100,000 the cumulative transfer among program activities or cost categories of $50,000 or more or 15 percent of the total plan budget, whichever is greater." 20 C.F.R. § 676.16(c)(1)(v).

The parties disagree as to the meaning of the phrase "total plan budget" in the above provision, and, therefore, as to the proper base to use in calculating when budgetary shifts exceed fifteen percent. DOL focuses on the lead-in phrase "Annual Plan subparts," asserting that the context makes clear that the base for calculating budgetary shifts is each total subpart budget. In other words, under DOL's interpretation, Colorado needed prior approval to shift dollars among cost categories if those shifts exceeded $50,000 or fifteen percent of the total budget for a subpart. Quiroz' undisputed testimony explained that "cost categories" include such categories as wages, fringe benefits, training, and services. Quiroz also testified that the purpose of the prohibition on budgetary transfers in excess of the stated amount is to assure that the basic focus of a program will not be changed without approval from DOL. In his view, an oversight function could not be exercised responsibly were the fifteen percent figure to be calculated as a percent of a large annual plan budget that included a number of subparts. DOL Hearing at 81–82.

In contrast, Colorado interprets the contested provision to apply to its entire CETA budget, emphasizing the phrase "total plan budget." Colorado asserts that it need account for proposed expenditure shifts among categories within a given subpart only when they exceed fifteen percent of the total federal allocation for all Colorado CETA grants during a fiscal year. The ALJ found that Colorado's interpretation would severely impede DOL's ability to monitor changes in grant program foci, and he accepted DOL's interpretation that the

regulation in question applied to budgetary shifts within individual subpart budgets.

■ Although our review of the ALJ's legal interpretation is *de novo*, we nonetheless give considerable deference to an agency's interpretation of its own regulations. "In construing administrative regulations, 'the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed. 2d 48 (1977) (citations omitted). In determining whether an agency's interpretation is plainly erroneous or inconsistent with the regulation, we follow the principle of regulatory construction that although "regulatory terms not given a specific regulatory definition are to be interpreted according to their commonly understood definitions," nonetheless a court " 'cannot concentrate on individual terms and ignore a consideration of the context in which the term appears.'" *Shepherd Oil, Inc. v. Atlantic Richfield Co.*, 734 F.2d 23, 29–30 (Temp. Em.Ct.App.1984) (quoting *Citronelle–Mobile Gathering, Inc. v. Edwards*, 669 F.2d 717, 719 (Temp.Em.Ct.App.), *cert. denied*, 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982)).

In construing the contextual meaning of "total plan budget," we examine subsections (c)(1) and (c)(2) of 20 C.F.R. § 676.16(c), which deal with substantive modifications to the Annual Plan. In their entirety, (c)(1) and (c)(2) read as follows:

"(c) Modifications to the Annual Plan. (1) Prior RA approval is required to modify:

(i) The duration of the Annual Plan or subparts of the Annual Plan;

(ii) The Annual Plan allocation;

(iii) An increase or decrease of 15% or more in the cumulative number of individuals to be served, planned enrollment levels for program activities, planned placements, terminations or individuals to be served within significant segments;

(iv) For Annual Plan subparts of $100,-000 or less, a cumulative transfer of $15,-000 among program activities or cost categories;

(v) For Annual Plan subparts of over $100,000, the cumulative transfer among program activities or cost categories of $50,000 or more or 15 percent of the total plan budget, whichever is greater; or

(vi) Significant changes in program design.

(2) Prime sponsors may not modify their Annual Plan solely to adjust planned performance to meet actual performance."

20 C.F.R. § 676.16(c)(1)(2).

Subsection (c)(2) makes clear that the budgetary modifications in (c)(1)(iv) and (v) concern the prospective budget, i.e., the planning process, and not subsequent adjustments in the budget that reflect actual unbudgeted expenditures. Approval is to be received *prior* to the rebudgeting of funds in ways that modify budget categories by more or less than fifteen percent of the "total plan budget." Subsection (c)(2) helps to emphasize that prime sponsors are to keep relatively tight control over expenditures within budgeted categories and that if actual expenditures exceed the budget, the budget is not to be changed after the fact solely to reflect the actual unbudgeted expenditures.

As for subsection (c)(1), we note that (c)(1)(iv) makes no reference to a total plan budget but refers to cumulative budgetary shifts of $15,000 in subpart budgets of $100,000 or less. While $15,000 represents a shift of fifteen percent in a $100,000 budget, it represents a shift of more than fifteen percent in budgets of less than $100,000. For instance, $15,000 would be twenty-five percent of a $60,000 subpart budget. In other words, the provision calls for prior approval of shifts of fifteen percent *or more* but not for shifts of less than fifteen percent.

It is logical to assume that the subsequent provision, (c)(1)(v) was meant to parallel (c)(1)(iv) and call for prior approval of shifts of fifteen percent or more ($50,000 would be "more" in some cases). Were DOL to fundamentally change its base of calculation and not require approval of

equivalent shifts in subpart budgets in excess of $100,000, it might no longer be in a position to monitor program foci. If it was concerned with budgetary shifts among cost categories within smaller subpart grants, logically it should be even more concerned with similar shifts where larger dollar amounts are at stake. Yet if it was concerned only when the cumulative transfers within larger subpart grants exceeded fifteen percent of an entire Annual Plan budget, fifteen percent in some cases would exceed an entire subpart budget. For instance, Colorado's FY 1981 total CETA grant budget approximated thirteen million dollars, and fifteen percent (1.95 million dollars) exceeded five of its subpart budgets for that year. *See* Government's Ex. G–D (Notice of Fund Availability); Audit Report at 8.

It makes more sense to conclude that (c)(1)(v) is to be read in tandem with (c)(1)(iv): in both provisions DOL is establishing what it considers to be the indicator of significant changes in program foci for *different-sized subpart budgets* and determining what level of budgetary shifts would trigger the prior approval require-ment. In short, we conclude that subsection (c)(1)(v) should be read consistently with (c)(1)(iv) and that the term "total plan budget" means "total subpart budget." [3]

We uphold DOL's interpretation of the regulatory provision in question. We also conclude that there was no evidence supporting Colorado's argument that the *interpretation* of the phrase "total plan budget" had changed with time.[4] We do view with some concern, however, the possibility that DOL may have had inconsistent approaches over time to *enforcement* of the provision. The undisputed allegation that DOL had overlooked Colorado's failure to seek the requisite prior approval for certain budgetary shifts during previous fiscal years and then unexpectedly changed the ground rules suggests that DOL's approach to federal-state relations may have been a bit cavalier. While we think DOL has a right to insist on compliance with its regulations and to tighten its enforcement when it finds it desirable, we think that a state should be clearly informed of major DOL shifts in enforcement approaches. If enforcement is left to the discretion of indi-

---

**3.** One explanation for the confusing use of the phrase "total plan budget" in subsection (c)(1)(v) was actually suggested, somewhat inadvertently, by Wagner at the DOL hearing. She testified that:

> "From what I've seen in fiscal year '82 ... they [DOL] changed their computerized system.... In fiscal year '81, *there was an annual plan for each title.* In fiscal year '82, there is one annual plan and each title is a subpart thereof."

DOL Hearing at 52 (emphasis added). In other words, apparently prior to FY 1982, annual plan budgets consisted of only one subpart, and therefore use of the phrase "total plan budget" would be synonymous with the phrase "total subpart budget." If that was indeed the case, and there is no testimony to suggest that it was otherwise, then when various subpart budgets were combined into one annual plan, the regulatory language may not have been adjusted accordingly. Nonetheless, total plan budget still referred to a total subpart budget.

We also note that the use of the word "total" to describe the budget does not indicate that the overall annual budget is being addressed. It simply clarifies that one is to take fifteen percent of whatever total budget is at stake, as opposed to fifteen percent of the cost category or categories from which funds are being shifted.

**4.** Colorado asserts that, according to Wagner's testimony, DOL in the past had applied the fifteen percent limitation to Colorado's total CETA plan. Petitioner's Opening Brief at 10. To the contrary, however, Wagner's statement was that "[i]n the '77 through '80 audit there was a line item overrun, and that was allowed on the basis that it did not exceed the total grant." DOL Hearing at 47. She then indicated that such overruns had been allowed several times "on the basis that they were not an overrun of the total grant budget." *Id.* at 48. These statements do not reveal whether or not the overruns exceeded fifteen percent of a cost category but simply indicate that they were compensated by decreases elsewhere so that the total grant budget was not exceeded. Furthermore, by specifying one of the "grant" budgets as an Indian CETA grant and another as a Migrant CETA grant, Wagner evidenced that she was not using the term "grant budget" to refer to the total Colorado CETA plan budget for a fiscal year. *See Id.* Wagner then testified that, in the past, failure to obtain prior approval had not resulted in cost disallowances where the costs were relevant and otherwise allowable. *Id.* at 50. This comment speaks to the question of enforcement of the prior approval requirement, rather than to a change in the interpretation of the term "total plan budget."

vidual Grant Officers, or if department-wide changes in enforcement policy are not signalled, grant recipients are subject to DOL inconsistencies which, in our view, should be eliminated.

## IV.

The fourth disallowance figure involves expenditures by a subrecipient, i.e., the Northwest Colorado Council of Governments ("NWCCOG"), which contracted with Colorado to produce video tapes and which purchased expensive video equipment with some of the CETA funds. The contract terms were ambiguous and could be construed to permit those equipment purchases, although Colorado insisted that use, rather than purchase, of equipment for video production was all that was intended under the contract. *See* Complainant's Ex. C–3 at 4 ("$40,850 will be used for equipment"). Under DOL regulations, such purchases required prior approval when unit costs exceeded $500. *See* 41 C.F.R. § 29–70.216–1(a) and § 29–70.216–7(a), as modified by 41 C.F.R. § 29–70.215–5. Such approval was not obtained. Colorado apparently discovered the equipment purchases after the fact. It sought assurance of NWCCOG's understanding that CETA funds were intended for the use rather than the purchase of equipment. Government's Ex. G–C at 1. The NWCCOG Executive Director responded that NWCCOG was "aware of your intent to support the *use* of equipment in developing your product" and that, unfortunately, NWCCOG's accountant (fiscal officer) had not been fully informed "and was under the impression that the funds were to be used to directly purchase equipment." *Id.* at 2 (emphasis in original). Colorado expressed its hope that it could avoid an audit exception by modifying NWCCOG's closeout package to reflect more clearly the intent of the contract not to allow purchase

of equipment.[5] *Id.* at 1. Sometime later, Colorado asked the NWCCOG accountant "why he had not made a prior period adjustment" to reflect the intended use of the CETA funds and to correct what Colorado saw as essentially an accounting error. DOL Hearing at 30. According to Wagner's testimony, the accountant "did not wish to deal with it" because the books were closed and he was in the process of leaving the NWCCOG. *Id.*

At the hearing, the ALJ observed that Colorado was responsible for the actions and omissions of its subrecipients and determined that since Colorado was to receive reimbursement from NWCCOG, requiring Colorado to reimburse the federal government would not impose too harsh a penalty. Additionally, the ALJ found that although funds had been spent on the programs for which they were intended, and although Colorado had not intentionally defrauded the federal government, nonetheless Colorado's record-keeping system was flawed, known violations had not been remedied, and some of them could have been avoided in the first place by simply obtaining prior approval. He found repayment to be an equitable sanction under the circumstances.

With respect to the ALJ's determination, Colorado asserts before this court that the record does not reflect any reimbursement from the NWCCOG and that, in the interests of equity, DOL should have waived repayment. Colorado insists that the problem arising with the NWCCOG had nothing to do with a flawed Colorado record-keeping system and was simply an error internal to the NWCCOG, for which Colorado should not be punished.

Under Section 106 of CETA, 29 U.S.C. § 816, DOL is given broad authority to determine the sanctions for CETA violations; it is also given authority to waive the right to recoupment.[6] In reviewing the

---

**5.** It is difficult to see how such a clarification would have avoided the audit exception, however, because under CETA and its regulations, the prime sponsor was responsible for the noncompliance of subrecipients regardless of who was initially at fault. *See* 29 U.S.C. § 816(d)(1); 20 C.F.R. § 676.37(a)(1) and (5).

**6.** Section 106(d)(2) of CETA, 29 U.S.C. § 816(d)(2), in pertinent part, provides that when "a public service employment program" is conducted in violation of various CETA statutory provisions or regulations, repayment is required "unless, in view of special circumstances as demonstrated by the recipient, the Secretary

exercise of agency authority, "courts give great deference to agency determinations of sanctions; absent an abuse of discretion, the agency determination will be affirmed. The sanction imposed must, however, have some relationship to the violation found by the agency." *City of Oakland v. Donovan*, 703 F.2d at 1107 (citations omitted). Here, there is no dispute over whether reimbursement for each unauthorized equipment purchase exceeding $500 bears a direct relationship to the violation. Instead, the dispute is over what reasons, if any, must be given for failure to grant a waiver sought by a CETA recipient.[7]

■ Under our ruling in *Action, Inc. v. Donovan*, the Secretary need not consider waiver of recoupment if plaintiff does not raise "substantial equitable considerations." *Action, Inc. v. Donovan*, 789 F.2d 1453, 1460 (10th Cir.1986). "Because waiver of recoupment is within the Secretary's discretion, the Secretary need not address this issue in every case before him. The Secretary is not required to respond to every frivolous or unsupported argument

that he should exercise his discretion to waive repayment of disallowed costs." *Action*, 789 F.2d at 1459–60. We assume, without deciding, that for purposes of the following discussion Colorado's arguments raised substantial equitable considerations.

■ The ALJ's primary reason for denying a waiver seemed to turn on his view that NWCCOG had agreed to reimburse Colorado for its $39,062 equipment purchases. The ALJ found that "considering the equities," Colorado's repayment "should not be too severe since NWCCOG has agreed to reimburse the Grantee for these expenditures." Decision and Order of February 12, 1987 at 6. Actually, the record does not substantiate the ALJ's statement that the NWCCOG had agreed to reimburse Colorado for the disallowed expenditures. It shows only that the modified contract between NWCCOG and Colorado required the NWCCOG to provide Colorado with a "production schedule and rates which will allow for the return of the total CETA investment either through utilization and/or cash reimbursement."

determines that requiring repayment would not serve the purposes of attaining compliance with such sections...."

**7.** Some uncertainty exists regarding whether (1) 29 U.S.C. § 816(d)(2) *requires* the Secretary to consider the equities in every case, (2) the Secretary must consider the equities only when special circumstances are raised by the plaintiff, or (3) whether the Secretary's exercise of discretion to waive repayment is limited to those circumstances specifically mentioned in 20 C.F.R. § 676.88(c). Some cases suggest that the Secretary need not ever consider the equities. In *City of St. Louis, Mo. v. United States Dept. of Labor*, 787 F.2d 342, 349 (8th Cir.1986), the court held that "the Secretary is not required to consider the equities" but "must impose sanctions" where violations have occurred. *See also Illinois Migrant Council, Inc. v. United States Dept. of Labor*, 773 F.2d 180, 183 (7th Cir.1985), holding that DOL has broad powers to impose sanctions and is not required to consider all the equities. In contrast, several other cases take the position that the equities are to be considered at least when raised by the CETA recipient or subrecipient. *See Action, Inc. v. Donovan*, 789 F.2d 1453, 1460 (10th Cir.1986) (where substantial argument for exercise of discretion is made, "Secretary must respond, setting forth the reasons for his exercise or lack of exercise of discretion"); *Onslow County, N.C. v. United States Dept. of Labor*, 774 F.2d 607, 614 (4th Cir.1985) (Secretary neglected to perform man-

datory duty to consider waiver in view of any "special circumstances" that might be shown). *Cf. Maine v. United States Dept. of Labor*, 669 F.2d at 832 (since Maine failed to ask for exercise of discretion, failure to make ruling was not error under Administrative Procedures Act); *Quechan Indian Tribe v. United States Dept. of Labor*, 723 F.2d at 736 (case remanded to Secretary to "consider all the equities;" no indication that plaintiff sought consideration of the equities or that equity issues were limited to those circumstances specified in § 676.88(c)).

The Secretary takes the position that recent Supreme Court decisions on related matters strengthen his position that he need consider the equities only in circumstances spelled out under 20 C.F.R. § 676.88(c), which lists five equitable factors to guide a decision to waive recoupment in situations where funds have been misspent on ineligible participants and public service employment programs. Dicta in *City of Camden, N.J. v. United States Dept. of Labor*, 831 F.2d 449, 452 (3d Cir.1987) (Secretary promulgated 20 C.F.R. § 676.88(c) to implement 29 U.S.C. § 816(d)(2)) also may support this position. We need not analyze this split of authority or construe the scope of our holding in *Action* because the ALJ, whether he needed to or not, did address the equities of recouping costs for excessive purchases without prior DOL approval.

Complainant's Ex. C–3 at 4. This statement does not indicate that NWCCOG did, would, or was required to reimburse Colorado for its investment of CETA funds; instead it simply reveals intent language that NWCCOG was to set rates that would "allow" a return on the funds advanced, either in terms of utilization by CETA of the videotapes produced under the grant or by cash reimbursement, or a combination of the two. The language of the modified contract states that "$40,850 [of the CETA monies] will be used for equipment, and the $68,781 balance will pay for staff who will develop and produce pilot projects, purchase equipment and market the tapes generated by the program." *Id.* From this language and Wagner's testimony acknowledging that CETA funds were *advanced* for the production of videotapes, DOL Hearing at 25, one can conclude that the funds were obviously not going to be used at that point to pay for Colorado's actual utilization of the videotapes. The contract language suggests that while NWCCOG might use CETA funds to acquire equipment (through lease or purchase) to make the videotapes, its books would reflect the use of CETA funds as a user's fee. Alternatively or additionally, NWCCOG might fully or partially reimburse Colorado with cash after collecting fees from other users of the tapes. In either event, Colorado anticipated but did not require some kind of "return on its investment." In fact, the record shows that Colorado had received copies of some of the finished tapes. DOL Hearing at 18. Although giving Colorado copies of the tapes is indeed giving it something for its money, it is not the same as returning to Colorado its CETA money so that it can pass the money on to DOL. We conclude that there was no evidence establishing an agreement to fully reimburse Colorado for the $39,062 in disallowed costs. Nonetheless, we do not view the ALJ's misstatement as a serious problem, because, as we discuss below, the ALJ cites independent grounds sufficient to support his conclusion that waiver was not required.

The ALJ's reasons for denying a waiver went beyond those addressing NWCCOG's authorized equipment purchases. In fact, the ALJ seemed to consider the fairness of waiver for all four of the disallowance figures, even though Colorado sought waiver only of the disallowance for the NWCCOG equipment purchases. The ALJ stated:

"[T]he Grantee knew of some of these violations even prior to the audit but failed to remedy them and ... the Grantee failed to fulfill important statutory and regulatory duties, especially in maintaining an adequate record-keeping system. Although the Grantee committed no intentional fraud and did spend the funds on programs for which they were intended, the Grantee merely had to acquire the Grant Officer's approval to avoid many of these violations."

Decision and Order of February 12, 1987 at 6. Although this language is broader than is required to address the equipment purchase situation, we conclude that it covers that situation as well. The ALJ's reference to the grantee's failure to acquire Grant Officer approval in multiple situations can be read as appropriately making Colorado bear the responsibility for the fact that its contract terms with NWCCOG were ambiguous and were interpreted by the NWCCOG accountant to allow CETA funds to be used for the purchase of equipment. In other words, contained within the ALJ's statement is the view that Colorado knew or should have known that NWCCOG would purchase equipment with the CETA funds, and that, therefore, Colorado should have seen to it that NWCCOG obtained prior approval for the purchases rather than seeking to have NWCCOG reflect the CETA contributions on the books as payment of fees for utilization of the completed videotapes.

■ There is no question but that Colorado can be held liable for violation of the regulations by a subrecipient. 29 U.S.C. § 816(d)(1); 20 C.F.R. § 676.37(a)(1) and (5). *See San Diego Regional Employment and Training Consortium v. United States Dept. of Labor,* 713 F.2d 1441, 1444 (9th Cir.1983); *Kentucky Dept. of Human Resources v. Donovan,* 704 F.2d 288, 297 (6th Cir.1983); *Milwaukee County v. Peters,*

682 F.2d 609, 612 (7th Cir.1982). As Quiroz testified, "[Colorado] is reponsible for assuring that its sub-recipients understand fully the terms of their contracts, and that the budget items are fully understood by both parties." DOL Hearing at 71–72. Where contractual terms are ambiguous and lead to noncompliance with CETA regulations, the failure to waive recoupment serves the purposes of attaining compliance, has no detrimental effect on Colorado's management of CETA programs, and creates an incentive for Colorado to more closely monitor its subrecipients and to write its contracts more clearly.

In conclusion, assuming that Colorado presented a substantial argument for a waiver and that some articulation of DOL's reasons for not waiving repayment was necessary, we think the ALJ's discussion of the equities was sufficient to indicate that he had considered the special circumstances involved in this case and found no good reason to waive repayment.

We AFFIRM the findings of the ALJ in all respects.