[No. C040761. Third Dist. Sept. 14, 2004.]

C&C CONSTRUCTION, INC., Plaintiff and Respondent, v.
SACRAMENTO MUNICIPAL UTILITY DISTRICT et al., Defendants and
Appellants.

## Counsel

Arlen R. Orchard; Namba Law Offices, Curtis R. Namba; Hansen, Culhane, Kohls, Jones & Sommer, Kevin R. Culhane and Betsy S. Kimball, for Defendants and Appellants.

Oren Sellstrom for Lawyers' Committee for Civil Rights of the San Francisco Bay Area as Amicus Curiae on behalf of Defendants and Appellants.

Mark D. Rosenbaum and Dan Tokaji for American Civil Liberties Union Foundation of Southern California as Amicus Curiae on behalf of Defendants and Appellants.

Sheila Thomas for Equal Rights Advocates as Amicus Curiae on behalf of Defendants and Appellants.

Alan Schlosser for American Civil Liberties Union of Northern California as Amicus Curiae on behalf of Defendants and Appellants.

Ruthe Catolico Ashley for National Asian Pacific American Bar Association as Amicus Curiae on behalf of Defendants and Appellants.

Patricia N. Canites for Human Rights/Fair Housing Commission of the City and County of Sacramento, Greater Sacramento Urban League, National Indian Contractors Association, Sacramento Asian Pacific Chamber of Commerce, Sacramento Black Chamber of Commerce, Sacramento Filipino Chamber of Commerce, Sacramento Hispanic Chamber of Commerce and Women Construction Owners & Executives, USA, as Amici Curiae on behalf of Defendants and Appellants.

Joanne Speers for League of California Cities as Amicus Curiae on behalf of Defendants and Appellants.

Dennis J. Herrera, City Attorney, Burk E. Delventhal, Randy Riddle, Ellen M. Forman and Teresa L. Stricker for City and County of San Francisco as Amicus Curiae on behalf of Defendants and Appellants.

Pacific Legal Foundation, Sharon L. Browne, Stephen R. McCutcheon, Jr., and Sharon M. Mathew for Plaintiff and Respondent.

## OPINION

**NICHOLSON, J.**—Defendant Sacramento Municipal Utility District (SMUD) discriminates on the basis of race in some of its public contracting activities. This case presents the question of whether this discrimination is permissible under section 31 of article I of the California Constitution (hereafter section 31).

■ Plaintiff C&C Construction (C&C) moved for summary judgment on its complaint for declaratory and injunctive relief in which it alleged that SMUD's affirmative action program, the 1998 Equal Business Opportunity Program, violates section 31, adopted by the voters on November 5, 1996, as the California Civil Rights Initiative (Proposition 209.) The relevant provision of section 31 declares: "The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." (§ 31, subd. (a).) A municipal contracting scheme that requires preferential treatment on the basis of race or gender violates this provision. (*Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537, 565 [101 Cal.Rptr.2d 653, 12 P.3d 1068] (*Hi-Voltage*).)

Conceding its affirmative action program applies race-based "participation goals" and in some cases "evaluation credits" in its public contracting, SMUD opposed C&C's motion and moved for summary judgment. It contended that the affirmative action program fell within the exception of subdivision (e) of section 31, which states: "Nothing in this section shall be interpreted as prohibiting action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the State."

The trial court granted C&C's motion and denied SMUD's motion. SMUD appeals the ensuing judgment and permanent injunction.

■ We conclude SMUD failed to proffer substantial evidence that its race-based discrimination is necessary to maintain federal funding.[1] We therefore affirm the judgment.

---

[1] Section 31, subdivision (e) allows race-based discrimination if it is necessary to *obtain* or *maintain* federal funding. SMUD presents only circumstances it asserts require race-based discrimination to maintain federal funding. Therefore, we refer only to maintaining federal funding. In any event, the analysis is the same.

## BACKGROUND

In 1988, SMUD's Board of Directors (Board) declared a policy of providing national leadership in affirmative action programs: "[T]his Board intends that SMUD shall continue to provide leadership on affirmative action in this community and in the utility industry nationally . . . ." Prior to 1989, SMUD undertook activities to have minority-owned businesses[2] perform more of its work and provide more of its goods and services. These activities included, among other things, (1) engaging in outreach activities directed at the small and minority business communities, (2) advertising contracting opportunities through minority media, (3) providing training and technical assistance, through one-on-one conferences with potential contractors, and various conferences sponsored by California State University, Sacramento, local governmental entities, trade groups, and minority chambers of commerce, (4) providing assistance in matters of financing, (5) easing some bonding and insurance requirements, and (6) offering training and technical assistance to foster prime contracting and subcontracting relationships.

In 1989, the United States Supreme Court decided *City of Richmond v. Croson Co.* (1989) 488 U.S. 469 [102 L.Ed.2d 854, 109 S.Ct. 706] (*Croson*). The court held that remedial affirmative action programs that incorporate race-based classifications are subject to the strict scrutiny standard of judicial review under the equal protection clause of the Fourteenth Amendment. (*Id.* at pp. 487–488.)

SMUD conducted a disparity study in 1993 that assessed whether the requisite factual conditions existed within SMUD's geographic market area to justify remedial discrimination in the form of a race-based affirmative action program, applying *Croson*. As reflected in the study's report, "[a]t the request of [SMUD], the study did not incorporate examination of race-neutral methods and techniques that were in place or that might be used to increase opportunities for minority and women-owned businesses in the area of public contracting. In addition, [SMUD] did not wish to have the consultant make proposals or recommendations for changes or improvements to its existing [race-neutral] program." The study found there were significant statistical disparities in the number of minority businesses awarded contracts, when analyzed in terms of the percent of contract dollars awarded, and concluded: "Based upon the evidence amassed in this study, [SMUD] would have justification for undertaking and implementing an active program aimed at eliminating historical, systemic barriers to equal opportunity in the area of

---

[2] SMUD's preferential treatment program prior to 1989 as well as its original and present affirmative action program extended to women-owned business enterprises. However, because C&C only challenges the race-based preferences, we make no further reference to gender-based classifications.

public contracting." The Board accepted the study, found that its outreach and other race-neutral programs had not increased participation by minority businesses as much as the Board desired, and concluded that race-based remedial action should be used to remedy past discrimination against the groups identified in the study. SMUD therefore implemented an affirmative action program that set race-based goals for utilization of minority businesses.

In November 1996, the California electorate approved Proposition 209, which amended the state Constitution to prohibit the state and its political subdivisions from "discriminat[ing] against, or grant[ing] preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of . . . public contracting." (§ 31, subd. (a); *Hi-Voltage, supra,* 24 Cal.4th at p. 541.) Subdivision (f) of section 31 provides that, "[f]or the purposes of this section, 'State' shall include, but not necessarily be limited to, the State itself, any city, county, city and county, public university system, including the University of California, community college district, school district, special district, or any other political subdivision or governmental instrumentality of or within the State."

Section 31 is similar to, but not synonymous with, the equal protection clause of the federal Constitution. Under equal protection principles, state actions that rely upon suspect classifications must be tested under strict scrutiny to determine whether there is a compelling governmental interest. Section 31 allows no compelling state interest exception. (*Hi-Voltage, supra,* 24 Cal.4th at p. 567.) Subdivision (a) of Section 31 "prohibits discrimination against or preferential treatment to individuals or groups regardless of whether the governmental action could be justified under strict scrutiny." (*Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16, 42 [112 Cal.Rptr.2d 5].)

Section 31 does not imply that racial discrimination and barriers do not exist. "States and their local subdivisions have many legislative weapons at their disposal both to punish and prevent present discrimination and to remove arbitrary barriers to minority advancement." (*Croson, supra,* 488 U.S. at p. 494.)

As noted, section 31 contains an exception to its prohibition against race-based discrimination. Subdivision (e) authorizes race-based governmental action "which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the State."

In 1998, after the adoption of section 31, SMUD conducted another disparity study to update the earlier study. The 1998 study included an evaluation of SMUD's progress in eliminating the contracting disparities identified in the 1993 study. The 1998 study showed improvement in the utilization of certain groups but concluded that a statistically significant disparity continued to exist among certain subsets of minority contractors in identified categories of SMUD's contracting.

After a public comment process, the Board accepted the updated results of the 1998 Disparity Study and found that a significant disparity existed in SMUD's utilization of minority businesses when compared to the number of available qualified minority businesses with respect to dollar expenditure participation in identified areas. Based upon this and other findings, the Board authorized SMUD's General Manager to implement an "Action Plan" to revise the affirmative action program.

The revised affirmative action program has several components applicable to certain certified minority businesses.[3] First, it has a 5 percent price advantage for prime contractors, capped at $50,000, in all proposals up to $1 million that are submitted by certified businesses owned by African-Americans or Hispanic-Americans. It has the same capped price advantage on all proposals over $50,000 for subcontracts less than $1 million submitted by certified businesses owned by Asian-Pacific-Americans or African-Americans.

Second, the affirmative action program extends evaluation credits to all prime contractors who obtain the subcontractor participation goal of 8 percent each for Asian-Pacific-American and African-American subcontractors on proposals over $50,000 for subcontracts less than $1 million.

---

[3] The affirmative action program defines "Minority-Owned Business Enterprise" to mean "an enterprise that is at least fifty-one (51) percent owned by a minority individual or group; or, in the case of any publicly owned business, at least fifty-one (51) percent of the stock of which is owned by one or more minorities; and whose daily management and daily business operations are controlled by one or more such individuals. [¶] 'African-Americans' means all persons having origins in any black racial groups of Africa. [¶] 'Hispanic-Americans' means all persons of Mexican, Puerto Rican, Cuban or Central or South American, or other Spanish or Portuguese culture or origin regardless of race. [¶] 'Asian Pacific Americans' means all persons having origins in Asia or the Indian subcontinent, including, but not limited to, persons from Japan, China, the Philippines, Vietnam, Korea, Samoa, Guam, the U.S. Trust Territories of the Pacific, Northern Marinas, Laos, Cambodia, Taiwan, India, Pakistan, and Bangladesh. [¶] 'Native Americans' means all persons having origin in any of the original peoples of North American or the Hawaiian Islands, in particular American Indians, Eskimos, Aleut or Native Hawaiians." We refer to Minority-Owned Business Enterprises simply as minority businesses in this opinion.

Third, the affirmative action program specifies broad outreach procedures to provide notification of the request for proposals. For contracts over $50,000, each contractor is required to provide written evidence of the steps it has taken to achieve the specified outreach requirements and to identify and include minority businesses. Included in these requirements is written evidence the contractor has (1) attended a SMUD affirmative action program briefing so that the contractor may fully understand the program requirements, (2) requested assistance from SMUD's affirmative action program office, (3) identified specified units of work that improve the likelihood of subcontracting, (4) contacted potential minority subcontractors not less than 10 days prior to the proposal due date, and (5) contacted interested minority subcontractors subsequent to the initial contact to determine with certainty whether they were interested in performing the specific work on the project.

Fourth, the affirmative action program requires contractors to document sufficient good faith efforts to meet the affirmative action program requirements and minority subcontractor participation goal requirements with respect to African-American and Asian-Pacific-American firms. This includes (1) efforts to comply with the notification procedures, (2) advertisements at least 10 days prior to the opening of proposals in at least one trade association and two minority focused media, one of them targeting African-American firms, (3) provision of information to the firms on the plans, specifications, and requirements for the subcontracts and assistance in reviewing those plans and specifications, (4) written proposals received from the firms seeking subcontract work and, if rejected, reasons why the proposals were rejected, and (5) efforts to assist the firms contacted in obtaining bonding, insurance and lines of credit, if required.

Contractors not meeting the goals for subcontracting with African-American and Asian-Pacific-American subcontractors and not complying with the good faith requirements of the program are deemed nonresponsive and their bids rejected.

The affirmative action program provides for bonuses and recognition for SMUD employees who meet the minority participation goals. In addition, the SMUD department "which performs the best against their annual targets will be entitled to receive an award celebration in their honor." SMUD's written affirmative action program cites no federal law or regulation and does not assert that any part of the program is needed to meet federal requirements.

The Board approved the revisions to the affirmative action program based upon the 1998 Disparity Study and directed the General Manager to implement the revisions. In so doing, the Board found: "At all material times and at the present [SMUD] receives federal grant funds in connection with: 1) the Rancho Seco Fuel Storage Project; 2) the Climate Change Fuel Cell Program; 3) the PVUSA Project; 4) the Utility Photovoltaic Team-up Program; 5) the Renewable Energy Production Incentive Program; and 6) the Electric and Hybrid Vehicle Technology Develop Program. . . ." The Board concluded "that significant disparity exists in [SMUD's] utilization of [minority businesses] when compared to the number of available qualified [minority businesses], with respect to dollar expenditure participation in the [areas identified]." All of SMUD's construction contracts under $1 million are subject to the affirmative action program provisions, not just those projects that are federally funded.

The Board resolution approving the 1998 Disparity Study and instructing the general manager to make adjustments to the race-based affirmative action program declared: "The race-conscious [affirmative action program] has been effective in remedying much of the past disparity, and it reasonably may be anticipated that, over time, the continued implementation of the [affirmative action program] will further reduce and eventually eliminate all contracting disparity." It continued: "As has been demonstrated, utilizing only race-neutral programs has not produced satisfactory results. Therefore, reverting to a race-neutral contracting program at this time would not produce the progressive and measurable results that have been enjoyed under the current [affirmative action program]."

The 1998 resolution stated that, because of its receipt of federal funding, SMUD is obligated to comply with "Title VI of the Civil Rights Act of 1964 [Title VI] (42 U.S.C. § 2000(d) et seq.), and all relevant implementing regulations." The resolution does not, however, state that the race-based affirmative action program is necessary to comply with Title VI and the implementing regulations. It also does not cite any specific federal regulation.

C&C, which does not meet the definition of a "Minority-Owned Business Enterprise" under the affirmative action program, entered bids on SMUD contracts. Therefore, C&C was not allowed to benefit from the measures that favored minority businesses and was required to comply with the affirmative action program to be considered a responsive bidder.

C&C brought suit against SMUD, seeking declaratory and injunctive relief. The complaint alleged that SMUD's affirmative action program violates section 31 because it gives preferential treatment to contractors on the basis of race. By answer, SMUD denied the allegations and alleged the affirmative action program comes within subdivision (e) of section 31 because it was "required to maintain [SMUD's] eligibility for the receipt of certain federal funds in connection with [SMUD's] ongoing operations."

The parties each filed motions for summary judgment. C&C asserted that SMUD's affirmative action program violates section 31 because it grants preferential treatment and discriminates on the basis of race in the operation of public contracting. C&C also asserted that SMUD cannot demonstrate that it must discriminate as a condition of establishing or maintaining eligibility for federal funding. In its opposition to C&C's motion for summary judgment, SMUD conceded the affirmative action program violates the general prohibition against race-based discrimination in subdivision (a) of section 31, but sought to establish that its affirmative action program comes within the exception of subdivision (e). The parties agreed that application of subdivision (e) to the affirmative action program is a question of law that may be determined from the undisputed facts in the record.

The trial court granted C&C's motion and denied SMUD's motion. The court held that the affirmative action program violates subdivision (a) of section 31. It reasoned that SMUD failed to establish an affirmative defense under subdivision (e) because it produced no evidence of express federal contractual conditions, laws, or regulations that made approval of federal funds contingent upon race-based discrimination. Nor did SMUD offer federal legal authority to support the conclusion that failure to use the affirmative action program would result in the loss of federal funds because federal agencies may not terminate funding without an administrative hearing and judicial review.

The judgment and permanent injunction declared SMUD's 1998 affirmative action program unconstitutional under section 31 "to the extent that it purports to or does grant preferential treatment to any individual or group on the basis of race, sex, color, ethnicity or national origin in the operation of public contracting." In its minute order, the court clarified that "[w]hile [C&C] may have attacked the entire plan, the only legal challenge ultimately litigated was that it violated Proposition 209." The injunction "permanently enjoined and restrained [SMUD] from enforcing or attempting to enforce, directly or indirectly, the 1998 Equal Business Opportunity Plan, or any other

similar program, to the extent that it purports to or does grant preferential treatment to any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public contracting now and in the future . . . ."

■ The parties agree that SMUD's race-based affirmative action program violates section 31, subdivision (a). The question in dispute on appeal is whether SMUD's race-based measures are necessary to maintain federal funding. Because the facts are undisputed and the parties agree that the issues can be decided based on the facts contained in the record, our task is to apply the law to the facts to determine whether the trial court properly entered judgment in favor of C&C. (See *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348 [1 Cal.Rptr.3d 32, 71 P.3d 296] [reviewing court to determine whether undisputed facts warrant judgment as matter of law].)

## DISCUSSION

### I

*Application of Section 31, Subdivision (e)*

■ As a threshold question, we must determine the nature of the showing necessary to justify race-based discrimination pursuant to subdivision (e) of section 31. We conclude that the state governmental agency, before imposing race-based measures, need not obtain a federal adjudication that race-based discrimination is necessary to maintain federal funding. We further conclude, however, that in order to discriminate based on race, the governmental agency must have substantial evidence that it will lose federal funding if it does not use race-based measures and must narrowly tailor those measures to minimize race-based discrimination.

SMUD takes the position that under the federal regulatory scheme it is required to (1) self-evaluate whether it discriminates, (2) refrain from discriminating, and (3) self-report its nondiscrimination by assuring its compliance with Title VI and its implementing regulations. The assurance includes compliance with regulations that mandate implementation of affirmative action programs to remedy the effects of any past discrimination.

C&C asserts that to establish a race-based affirmative action program, SMUD is required under federal law to (1) exhaust federal administrative procedures, (2) obtain a final federal agency determination that it cannot establish or maintain eligibility for federal funding without a race-based affirmative action program, and (3) suffer actual loss of or threatened loss of federal funds.

■ The language of section 31, subdivision (e) does not support C&C's position. " 'A constitutional amendment should be construed in accordance with the natural and ordinary meaning of its words.' [Citation.]" (*Hi-Voltage, supra,* 24 Cal.4th at p. 559, quoting *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].) Considering the plain meaning of the text, we find the language in subdivision (e) does not require SMUD to obtain a final administrative or judicial determination that its race-based affirmative action program is required as a condition of eligibility for federal funding before it uses race-based measures. The trigger point of subdivision (e) is "eligibility" to participate in a federally funded program, "where ineligibility would result in a loss of federal funds to the State." A construction that would require a state entity to become ineligible for federal funds before it can lawfully implement a race-based affirmative action program required by federal law would interfere with the entity's ability to establish eligibility for federal money. Such a result is inconsistent with the language and purpose of subdivision (e).

■ To be lawful under section 31, subdivision (e), SMUD's action "must be taken to establish or maintain eligibility for any federal program, where ineligibility *would result* in a loss of federal funds to the State." (Italics added.) The conditional phrase does not state "does result" or "has been determined to result." Rather, "would" connotes a contingency or likelihood of loss, not the actuality of loss. Subdivision (e) does not require SMUD to render itself ineligible for participation in a federal program before it may implement a race-based affirmative action program. It is sufficient to show that, under the federal laws and regulations, the failure to implement a race-based affirmative action program would subject SMUD to the loss of the funds.

■ Self-evaluation and self-reporting, however, do not give a state agency unfettered latitude to discriminate. An agency's determination that race-based discrimination is necessary to maintain federal funding must be supported by substantial evidence. For example, if a federal regulation expressly requires a state agency to use race-based measures to remedy past discrimination, the state agency must have substantial evidence of the type of past discrimination that triggers the federal regulation's requirement for current race-based measures. What facts, if present, require race-based remedial measures—the factual predicate for race-based measures—must be defined in the federal law or regulation, not by the state agency. (See *Croson, supra,* 488 U.S. at pp. 505–506 [requiring factual predicate of past racial discrimination to justify race-based affirmative action in context of constitutional equal protection analysis].)

Here, SMUD's disparity studies concluded that there had been past discrimination. As will be discussed, however, SMUD made no attempt in its disparity studies to identify federal laws and regulations and to test factual findings against those laws and regulations. Nor did it study whether race-neutral programs would suffice.

Once a factual predicate for current race-based measures is established, the state agency must narrowly tailor its remedy to conform to the federal requirement in the least discriminatory manner. Because the California Constitution allows race-based discrimination for no reason other than to maintain federal funding (see *Connerly v. State Personnel Bd., supra,* 92 Cal.App.4th at p. 42 [section 31 prohibits discrimination even if justified under strict scrutiny standard]), discrimination beyond that necessary to maintain federal funding is prohibited by section 31, subdivision (a), and is not excepted from that prohibition by subdivision (e).

II

*The Definition of "Discrimination"*

Before we can resolve the issues presented in the trial court, we must consider a law enacted during the pendency of this appeal which purports to define the word "discrimination," as it is used in section 31. The California Supreme Court has interpreted "discrimination" in section 31 as having a fixed definition. " 'A constitutional amendment should be construed in accordance with the natural and ordinary meaning of its words. [Citation.]' [Citations.] Nothing in the [Proposition 209] ballot arguments or in the Legislative Analyst's analysis suggests that a different rule should apply with respect to 'discriminate' and 'preferential treatment' as used in section 31, or that the voters intended them to have any specialized meaning. [Citations.] '[D]iscriminate' means 'to make distinctions in treatment; show partiality (*in favor of*) or prejudice (*against*)' [citation]; 'preferential' means giving 'preference,' which is 'a giving of priority or advantage to one person . . . over others.' [Citation.]" (*Hi-Voltage, supra,* 24 Cal.4th at pp. 559–560, italics in original, fn. omitted.)

" 'Rather than classifying individuals by race or gender, Proposition 209 *prohibits* the State from classifying individuals by race or gender.' [Citations.] The ballot arguments—from which we draw our historical perspective—make clear that in approving Proposition 209, the voters intended section 31, like the Civil Rights Act as originally construed, 'to achieve equality of [public employment, education, and contracting] opportunities' [citation] and to remove 'barriers [that] operate invidiously to discriminate on the basis of racial or other impermissible classification.' [Citation.] In short, the electorate

desired to restore the force of constitutional law to the principle articulated by President Carter on Law Day 1979: ' "Basing present discrimination on past discrimination is obviously not right." ' [Citation.]" (*Hi-Voltage, supra,* 24 Cal.4th at pp. 561–562, italics in original.)

SMUD recognized this definition of "discrimination" when it acknowledged, during summary judgment proceedings, that its race-based affirmative action program violates subdivision (a) of section 31. While this appeal was pending, however, the Legislature passed and the Governor signed a bill attempting to change the definition of discrimination. Signed by the Governor in August 2003, nearly three years after *Hi-Voltage* was decided, Assembly Bill No. 703 declared that the term "racial discrimination" is not defined in section 31 and continued: "The lack of a legal definition for that term has led to confusion and conflict over implementation of Section 31 of Article I of the California Constitution." (Stats. 2003, ch. 211, § 1(b).) Therefore, the bill, purporting "[t]o clarify confusion," attempted to define "racial discrimination" in section 31 to be consistent with the definition of "racial discrimination" found in the International Convention on the Elimination of All Forms of Racial Discrimination (Convention), which was adopted by the United Nations in 1965 and ratified by the United States Senate in 1994. (Stats. 2003, ch. 211, § 1(f).)[4]

The Convention defines "racial discrimination" as follows:

" 'In this Convention, the term "racial discrimination" shall mean any distinction, exclusion, restriction or preference based on race, colour, descent, or national or ethnic origin which has the purpose or effect of nullifying or impairing the recognition, enjoyment or exercise, on an equal footing, of human rights and fundamental freedoms in the political, economic, social, cultural or any other field of public life.' [¶] . . . 'Special measures taken for the sole purpose of securing adequate advancement of certain racial or ethnic groups or individuals requiring such protection as may be necessary in order to ensure such groups or individuals equal enjoyment or exercise of human rights and fundamental freedoms shall not be deemed racial discrimination, provided, however, that such measures do not, as a consequence, lead to the maintenance of separate rights for different racial groups and that they shall not be continued after the objectives for which they were taken have been achieved.' "[5] (Stats. 2003, ch. 211, § 2; Gov. Code, § 8315, subd. (b).)

---

[4] C&C requests us to take judicial notice of some of the legislative history of Assembly Bill No. 703. Because the statute is clear, we need not consider the legislative history. Therefore, we deny the request as unnecessary.

[5] SMUD requests us to take judicial notice of the Convention and of the United States Senate's ratification. We grant this request.

Noting the enactment of this new statute, we requested supplemental briefing from the parties concerning its effect on this case. In response, SMUD frankly acknowledged that "the rules of construction set forth in California Government Code section 8315 appear to directly contravene the judicial construction upon the terms 'discriminate' and 'preference' in [*Hi-Voltage*]." SMUD concludes: "To the extent that [*Hi-Voltage*] correctly interpreted the intention of the voters regarding the meaning of the terms 'discriminate' and 'preference' in Proposition 209, contrary legislative interpretations would be required to yield." (Fn. omitted.) We agree.

■ The California Supreme Court determined that the word "discriminate" in section 31 is to be interpreted according to its plain meaning. The definition of "racial discrimination" in the Convention conflicts with the Supreme Court's interpretation because the Convention's definition allows for exceptions to the plain meaning definition of "discrimination." The Supreme Court is the final authority on interpretation of the state Constitution. (*Sands v. Morongo Unified School Dist.* (1991) 53 Cal.3d 863, 902–903 [281 Cal.Rptr. 34, 809 P.2d 809].) Therefore, its definition is controlling.

"[I]t is well settled that when the Legislature is charged with implementing an unclear constitutional provision, the Legislature's interpretation of the measure deserves great deference. [Citations.]" (*People v. Birkett* (1999) 21 Cal.4th 226, 244 [87 Cal.Rptr.2d 205, 980 P.2d 912].) Section 31, however, contains no ambiguity concerning the term "discrimination." Section 31 does not charge the Legislature with its implementation; it is self-executing. (§ 31, subd. (h).) Furthermore, there can be no doubt concerning the meaning of "discrimination" as it relates to the Civil Rights Act of 1964 and, by extension, the implementing federal regulations. " 'There is no sound basis for uncertainty about the meaning of discrimination in the context of the civil rights bill. It means a distinction in treatment given to different individuals because of their different race, religion, or national origin.' " (*Steelworkers v. Weber* (1979) 443 U.S. 193, 236 [61 L.Ed.2d 480, 509, 99 S.Ct. 2721], fn. 16 (dis. opn. of Rehnquist, J.), quoting 110 Cong. Rec. 7477 (1964).)

■ Assembly Bill No. 703 amounted to an attempt by the Legislature and the Governor to amend the California Constitution without complying with the procedures for amendment. This attempt was manifestly beyond their constitutional authority. By a vote of two-thirds of the membership of each house, the Legislature may propose to the electorate an amendment to the state Constitution. (Cal. Const., art. XVIII, § 1.) Assembly Bill No. 703 was approved by a simple majority of each house and, in any event, did not submit the question to the electorate. The Legislature cannot amend the Constitution by a simple majority vote, as it attempted to do here.

■ Even though it concedes the definition of "discrimination" in Government Code section 8315 is ineffective, SMUD asserts we must nevertheless apply that definition, including its exception for "special measures," because the United States Senate ratified the Convention, using its treaty power. The United States Senate ratified the Convention in 1994, but SMUD raised this argument for the first time in its supplemental briefing on appeal. ■ Since the argument could have been raised in the trial court and in the original briefing in this court, it is forfeited. (*People v. Freeman* (1994) 8 Cal.4th 450, 487, fn. 3 [34 Cal.Rptr.2d 558, 882 P.2d 249].)

■ Furthermore, the Convention does not allow these "special measures" unless there are "certain racial or ethnic groups or individuals requiring such protection as may be necessary in order to ensure such groups or individuals equal enjoyment or exercise of human rights and fundamental freedoms . . . ." (Internat. Convention on the Elimination of All Forms of Racial Discrimination, art. I, § 4; <http://www.unhchr.ch/html/menu3/b/d_icerd.htm> [as of Sept. 14, 2004].) In California, the people are sovereign, whose power may be exercised by initiative. (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 341 [276 Cal.Rptr. 326, 801 P.2d 1077].) By adopting section 31, the people have determined, by implication, that special measures are not only unnecessary to ensure human rights and fundamental freedoms in California, but inimical to those principles. Therefore, "special measures," in the form of exceptions to the plain meaning of "discrimination," are not permitted in California, even under the Convention. Certainly, SMUD does not have the authority to determine otherwise, contrary to the sovereign's will.

### III

### *Federal Laws and Regulations Concerning Discrimination and Affirmative Action*

As noted above, SMUD receives funding, either directly or indirectly, from three federal agencies: the Departments of Energy, Defense, and Transportation. To determine whether SMUD's affirmative action program, which uses remedial race-based discrimination, is necessary to maintain eligibility for federal funding, we start with an analysis of the history of federal laws concerning discrimination and affirmative action.

On March 6, 1961, President John F. Kennedy issued Executive Order No. 10925, establishing the President's Committee on Equal Employment Opportunity. He declared that discrimination is contrary to the constitutional principles and policies of this nation, the federal government has a "plain and positive obligation . . . to promote and ensure equal opportunity for all

qualified persons," and it is "the policy of the executive branch . . . to encourage by positive measures equal opportunity for all qualified persons . . . ." (Exec. Order No. 10925, 26 Fed. Reg. 1977 (Mar. 6, 1961), opening declarations.) The executive order required government contractors, as a contractual term, to "take *affirmative action* to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin." (Exec. Order No. 10925, *supra*, § 301, italics added.)

Three years later, Congress passed, and President Lyndon B. Johnson signed, the Civil Rights Act of 1964. Included in that act was Title VI, which prohibited discrimination on the basis of race in all programs or activities receiving federal financial assistance. (42 U.S.C. § 2000d.) Federal agencies that extend federal financial assistance to any program or activity, by way of grant, loan, or contract, are authorized to promulgate regulations that give effect to the provisions of section 2000d. Title VI is based upon a policy of voluntary compliance, and funding cannot be terminated without following formal agency procedures. (42 U.S.C. § 2000d-1.)

In a concurring opinion filed in 1987, Justice John Paul Stevens summarized the United States Supreme Court's treatment of the Civil Rights Act of 1964 in the context of employment, which is governed by Title VII of the act:

"Prior to 1978 the Court construed the Civil Rights Act of 1964 as an absolute blanket prohibition against discrimination which neither required nor permitted discriminatory preferences for any group, minority or majority. The Court unambiguously endorsed the neutral approach, first in the context of gender discrimination and then in the context of racial discrimination against a white person. As I explained in my separate opinion in *Regents of University of California v. Bakke*, 438 U.S. 265, 412–418 [57 L.Ed.2d 750, 98 S.Ct. 2733] (1978), and as the Court forcefully stated in *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 280 [49 L.Ed.2d 493, 96 S.Ct. 2574] (1976), Congress intended ' "to eliminate all practices which operate to disadvantage the employment opportunities of any group protected by Title VII, including Caucasians" ' (citations omitted). If the Court had adhered to that construction of the Act, petitioner would unquestionably prevail in this case. But it has not done so.

"In the *Bakke* case in 1978 and again in *Steelworkers v. Weber*, 443 U.S. 193 [61 L.Ed.2d 480, 99 S.Ct. 2721] (1979), a majority of the Court interpreted the antidiscriminatory strategy of the statute in a fundamentally different way. The Court held in the *Weber* case that an employer's program designed to increase the number of black craftworkers in an aluminum plant did not violate Title VII. It remains clear that the Act does not *require* any employer to grant preferential treatment on the basis of race or gender, but

since 1978 the Court has unambiguously interpreted the statute to *permit* the voluntary adoption of special programs to benefit members of the minority groups for whose protection the statute was enacted. Neither the 'same standards' language used in *McDonald,* nor the 'color blind' rhetoric used by the Senators and Congressmen who enacted the bill, is now controlling." (*Johnson v. Transportation Agency* (1987) 480 U.S. 616, 642–644 [94 L.Ed.2d 615, 637–639, 107 S.Ct. 1442] (conc. opn. of Stevens, J.), fns. omitted, italics in original.)

 While the cases interpreting the Civil Rights Act of 1964 may allow race-based remedies, they have not required them. The act cannot be said to "require what it barely permits." (*Coalition for Economic Equality v. Wilson* (9th Cir. 1997) 122 F.3d 692, 709 [discussing the Fourteenth Amendment].)

IV

*SMUD's Rationale for Discriminating*

SMUD asserts its affirmative action program complies with the requirements of regulations promulgated by the federal Departments of Energy, Defense, and Transportation to implement Title VI. We must consider each regulation to determine (1) whether it establishes a factual predicate for requiring race-based affirmative action and (2), if it does, to what extent race-based measures are required.

A. *Department of Energy*

The declared purpose of the Department of Energy regulations is "to implement Title VI of the Civil Rights Act of 1964 . . . in connection with any program or activity receiving Federal financial assistance from the Department of Energy . . . ."[6] (10 C.F.R. § 1040.1(a) (2004).) "If the Director [of the Office of Equal Opportunity of the Department of Energy] finds that a recipient has discriminated against persons on the basis of race, color, national origin, sex, handicap, or age in any program or activity receiving Federal financial assistance, the recipient shall take remedial action as the Director considers necessary to overcome the effects of the discrimination." (10 C.F.R. § 1040.7(a) (2004); see also 10 C.F.R. § 1040.3(k) (2004) (defining "director").) According to SMUD, this section "provides that [Department of Energy] grant recipients **must** take remedial action to overcome the effects

---

[6] C&C asserts the Department of Energy regulations are irrelevant because SMUD does not receive funds directly from that department; instead, SMUD receives funds as a result of a separate contract with an entity that receives funds from the department. For the purpose of argument, we will assume SMUD is subject to the regulations of the Department of Energy.

of past discrimination." (Boldface in original.) By not quoting the language of the section, however, SMUD attempts to avoid the language providing that action must be taken only if the Director of the Office of Equal Opportunity (1) finds discrimination and (2) requires the funding recipient to take action *"as the Director considers necessary . . . ."* (Italics added.) Therefore, SMUD's citation of this section and claim that the section requires SMUD to take action are misleading because there is no evidence the Director of the Office of Equal Opportunity has found SMUD discriminated or has required SMUD to take any action to remedy discrimination.[7]

SMUD then cites and quotes portions of subpart (c) of the same section, which requires recipients of funding from the Department of Energy to evaluate their policies and practices and the effects of those policies and practices and then "[t]ake appropriate remedial steps to eliminate the effects of discrimination which resulted or may have resulted from adherence to . . . questionable policies and practices." (10 C.F.R. § 1040.7(c)(3) (2004).)[8]

 This regulation requires "appropriate remedial steps to eliminate effects of discrimination." This general language includes race-neutral remedies and, therefore, does not, on its face, require race-based remedies. SMUD offers no argument or authority that the Department of Energy requires race-based discrimination, either in general or, specifically, in SMUD's case, as an "appropriate remedial step[]." It would appear that the Department of Energy, by using the general term "appropriate," meant for the funding recipient to consider the state laws and regulations relevant to that recipient when determining what action to take. In SMUD's case, such consideration includes the limitations of section 31.

After citing these two subsections of section 1040.7, SMUD declares, in bold text, **"The fact that [SMUD] must comply with the foregoing regulatory requirements to establish and/or maintain its eligibility to participate in [Department of Energy]-funded programs is alone wholly**

---

[7] While at first blush this may seem at odds with our holding above, that it is unnecessary for SMUD to render itself ineligible for federal funding by means of a federal adjudication, this specific regulation, on its face, requires no action unless the Department of Energy has found that remedial action is necessary. Presumably, the state agency, without losing its federal funding eligibility, would be allowed to comply with any requirements imposed by the Department of Energy.

[8] "Self-evaluation. Each recipient shall, within one year of the effective date of this part: [¶] (1) Whenever possible, evaluate, with the assistance of interested persons, including handicapped persons or organizations representing handicapped persons, its current policies and practices and the effects thereof that do not or may not meet the requirements of this part; [¶] (2) Modify any policies and practices which do not or may not meet the requirements of this part; and [¶] (3) Take appropriate remedial steps to eliminate the effects of discrimination which resulted or may have resulted from adherence to these questionable policies and practices." (10 C.F.R. § 1040.7(c) (2004).)

**dispositive of the issues posed in this appeal.**" As we have noted, these regulations do not require SMUD's current race-based affirmative action.

In October 2000, an "Assistant General Counsel For Procurement and Financial Assistance" for the Department of Energy sent a letter to SMUD's general counsel, which stated: "[A] recipient entity is required to take appropriate remedial steps to eliminate the effects of past and ongoing discrimination on the basis of race, color, national origin, sex, handicap or age. 10 CFR § 1040.7(c)(3). If a recipient entity fails to take appropriate remedial steps, including targeted race and gender conscious remedies, where necessary to eliminate the effects of such discrimination, it may fail to comply with the mandatory directives of the Department's regulations and, consequently, may fail to meet the requirements for continued receipt of Federal funds under programs administered by [the Department of Energy]." This letter, of course, is not a regulation. Facially, it is the opinion of but a single lawyer. The letter, itself, states that funding is contingent upon complying with "the mandatory directives of the Department's regulations . . . ." Accordingly, the letter is not an independent source of federal requirements. It also does not attempt to apply the regulation to SMUD's specific situation. Therefore, it does not impose on SMUD any requirement to use race-based discrimination as a remedy for past discrimination.

The citation of 10 Code of Federal Regulations part 1040.7(c)(3) (2004) in the letter does not provide authority for the declaration that the action must include race-based remedies. As noted above, that subsection does not require race-based remedies.

### B. *Department of Defense*

SMUD cites one Department of Defense regulation as authority for its race-based affirmative action program. The regulation states: "In administering a program regarding which the recipient has previously discriminated against persons on the ground of race, color, or national origin, the recipient must take affirmative action to overcome the effects of prior discrimination." (32 C.F.R. § 195.4(b)(4)(i) (2003).)

After citing this regulation, SMUD states: "Once again, the fact that the challenged elements of the [race-based affirmative action program] represent actions that must be taken to establish and/or maintain [SMUD's] eligibility to participate in the [Department of Defense program] reveals the error of the trial court's ruling." We have established, above, that affirmative action includes both race-neutral and race-based actions to alleviate or avoid discrimination. Therefore, the fact that the Department of Defense requires SMUD to "take affirmative action to overcome the effects of prior discrimination" does not, alone, require SMUD to use race-based measures. SMUD's

simplistic citation of the Department of Defense regulation as a justification for the race-based affirmative action program fails to support its contention that the trial court judgment must be reversed. This is a particularly disingenuous citation and argument in light of SMUD's specific directions to its disparity study consultants in 1993 not to research or discuss changes or improvements in its race-neutral affirmative action initiatives and its failure since then to investigate or consider race-neutral remedies.

### C. *Department of Transportation*

The Department of Transportation has a regulation, although SMUD does not specifically cite and discuss the provision, similar to the Department of Defense regulation just discussed. The Department of Transportation regulation requires funding recipients to "take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage." (49 C.F.R. § 21.5(b)(7) (2003).) Analysis of the entire subsection, however, reveals that the Department of Transportation does not require race-based affirmative action, even though it allows such action. The subsection states:

"This part does not prohibit the consideration of race, color, or national origin if the purpose and effect are to remove or overcome the consequences of practices or impediments which have restricted the availability of, or participation in, the program or activity receiving Federal financial assistance, on the grounds of race, color, or national origin. Where prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity to which this part applies, the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage. Even in the absence of prior discriminatory practice or usage, a recipient in administering a program or activity to which this part applies, is expected to take affirmative action to assure that no person is excluded from participation in or denied the benefits of the program or activity on the grounds of race, color, or national origin."

The first sentence of this subsection allows ("does not prohibit") the recipient of federal funding to use race-based measures to remedy past discrimination. The second sentence imposes a duty on the recipient to "take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage" but does not, on its face, require that those measures be race-based. If the drafters had intended the second sentence to limit remedies for discrimination to race-based measures only, then the first sentence would have been superfluous—permitting what is required in the second sentence.

The third sentence states an expectation that the recipient will "take affirmative action to assure that no person is excluded from participation . . . ." Thus, this three-sentence subsection uses the term "affirmative action" twice, once in the sentence requiring "affirmative action" to remedy past discrimination and then again in the sentence allowing "affirmative action" to avoid discrimination. While the regulation does not define "affirmative action," there is no indication the term has two different definitions within the same subsection. (See *People v. Dillon* (1983) 34 Cal.3d 441, 468 [194 Cal.Rptr. 390, 668 P.2d 697] [presumption that term has same meaning when used twice in statute].) Furthermore, race-based affirmative action is constitutionally prohibited where there has been no prior discrimination. (*Croson, supra,* 488 U.S. at pp. 505–506.) Accordingly, the term "affirmative action," as used in this subsection *must* include a race-neutral component.

██ Although the first sentence allows race-based affirmative action, it does not require it. The second sentence requires "affirmative action," which may be either race-neutral or race-based. Because in California the electorate has determined that race-based affirmative action is prohibited, an agency in California receiving funding from the Department of Transportation must opt for race-neutral affirmative action to comply with the second sentence of this subsection. In other words, because there is an option to use race-neutral affirmative action to comply with the *mandates*, as opposed to the permissions of this subsection, race-based affirmative action is not necessary to maintain federal funding and therefore cannot be used in California.

### D. *Maintaining Federal Funding*

To maintain federal funding, SMUD must certify its compliance with federal regulations regarding discrimination. (See, e.g., 49 C.F.R. § 21.7(a)(1) [the Department of Transportation requires assurance of compliance with regulations].) SMUD asserts that if we affirm the trial court's judgment it will no longer be able to certify that it complies with the federal regulations and will lose funding. This assertion fails, however, because SMUD has not cited any law or regulation to establish that the race-based measures contained in its current affirmative action program are necessary to maintain federal funding. Furthermore, even though SMUD's unspecified, race-neutral efforts to remedy past discrimination more than a decade ago were ineffective, nothing in the record establishes that SMUD cannot utilize an affirmative action program that imposes only race-neutral measures and thereby maintain federal funding.

SMUD argues that it "did not . . . procure the [1998] disparity study as part of some master plan to justify a [race-based affirmative action program]. Rather . . . , as a participant in federally funded programs, [SMUD] was obligated to self-evaluate its non-discrimination practices and procedures (long before Proposition 209 was ever proposed)." SMUD provides no record citation to support this statement. In fact, the disparity studies and affirmative action programs imposed did not cite to any particular federal regulation requiring race-based remedies. Indeed, the disparity studies were designed to determine whether the Supreme Court decision in *Croson* permitted race-based affirmative action, not whether any federal regulation required such action. The 1998 disparity study and SMUD's use of the study to justify race-based discrimination ignored SMUD's constitutional burden under section 31 to prefer race-neutral remedies over race-based remedies and avoided a determination of whether there were race-neutral alternatives available to remedy disparities in contracting.[9] Far from showing the program was narrowly tailored to maintain federal funding while complying to the extent it could with section 31, subdivision (a), SMUD simply adopted a race-based affirmative action without regard to section 31, subdivision (a) and, only later, tried to justify its actions.

When SMUD did its disparity studies and drafted its affirmative action program, it did not take into account any federal law or regulation concerning the use of race-based affirmative action to remedy past discrimination. Nor did it consider race-neutral opportunities. Accordingly, it made no effort to determine whether there was a factual predicate for its race-based measures, let alone to determine whether its measures were narrowly tailored to comply with federal regulations in the least discriminatory manner. Finally, its attempt to justify its race-based remedies in this litigation fails. It has identified no federal law or regulation that requires these remedies under the circumstances presented.

---

[9] A statistical disparity in the proportion of contracts or contract dollars awarded to a particular group may raise an inference of prejudice but it does not, standing alone, demonstrate that actual prejudice exists. (*Associated General Contractors of Ohio, Inc. v. Drabik* (6th Cir. 2000) 214 F.3d 730, 734–735.) Because SMUD has failed to identify or cite any federal law or regulation that requires it to impose race-based measures in its affirmative action program, we need not determine whether the statistical disparities found in SMUD's studies were sufficient to show past discrimination. As noted above, the factual predicate for imposing a race-based program is defined by the federal law or regulation. Without a federal law or regulation that requires a race-based program, there is no way to determine whether a simple showing of a disparity, which normally only raises an inference of discrimination, is a sufficient factual predicate to justify a race-based program.

██ On review after summary judgment in favor of a plaintiff, we affirm if there is no triable issue of material fact and the plaintiff is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Here, C&C has shown it is entitled to judgment against SMUD because SMUD's affirmative action program violates section 31 and SMUD has not shown its program is necessary to maintain federal funding.[10]

## V

### *Conclusion*

Conceding that it discriminates under section 31, subdivision (a), SMUD must argue its discrimination is necessary to maintain federal funding and therefore permissible under section 31, subdivision (e). Because the regulations require affirmative action to remedy past discrimination and affirmative action may be either race-based or race-neutral, SMUD cannot impose race-based affirmative action unless it can establish that it cannot remedy past discrimination with race-neutral measures. The California Constitution requires the state agency to comply with *both* the federal laws and regulations *and* section 31, subdivision (a), if possible. Applying these basic principles to the undisputed facts of this case shows why SMUD has failed to provide substantial evidence justifying its discrimination.

For some period of time until more than a decade ago, SMUD employed some form of race-neutral affirmative action. The 1993 disparity study showed that disparities existed (raising an inference of discrimination), despite the race-neutral affirmative action program. At that point, SMUD could have determined whether there were other race-neutral remedies it could employ. (SMUD has never contended it utilized all permissible race-neutral remedies before the 1993 study.) Instead, SMUD told the consultant not to propose or recommend race-neutral remedies. This is because the 1993 disparity study was undertaken to determine whether race-based remedies

---

[10] Although the parties never broached the issue and the court did not raise it during oral argument, our dissenting colleague contends the result we reach is preempted by federal regulations. He asserts that C&C cannot challenge SMUD's affirmative action program in state court as a violation of section 31, subdivision (a) because the federal regulations provide for a federal challenge to the affirmative action program as a violation of Title VI and the implementing regulations. We need not address the issue because the parties did not raise it, and for good reason. C&C alleges a violation of section 31, subdivision (a), not of Title VI and the implementing regulations. The dissent's approach, therefore, would effectively insulate SMUD from *any* challenge to the affirmative action program based on section 31, subdivision (a). Furthermore, SMUD's compliance with section 31, subdivision (a) is not preempted by the federal regulations if SMUD can comply with *both* section 31, subdivision (a) *and* the federal regulations. That is the question we decide.

could be justified under *Croson*. Therefore, SMUD abandoned race-neutral remedies, explicitly precluding consideration of new or additional race-neutral remedies. The 1993 disparity study was not a determination that the disparity could not be eliminated with race-neutral remedies. It was merely a determination that past discrimination justified race-based remedies under *Croson*.[11]

After adoption of Proposition 209, SMUD conducted its 1998 disparity study. Again, disparities were found. And again, no thought was given to race-neutral remedies.

Accordingly, while SMUD may have tried some race-neutral remedies to eliminate disparities in contracting more than a decade ago, it did not determine then that there were no other race-neutral remedies it could utilize. And, since then, it has refrained from considering race-neutral remedies, at all.

## DISPOSITION

Any remaining requests for judicial notice are denied as unnecessary or irrelevant. The judgment and permanent injunction are affirmed. C&C shall recover its costs on appeal. (Cal. Rules of Court, rule 27(a).)

Raye, J., concurred.

**RAYE, J., Concurring.**—For good or ill, in 1996 the electorate saw fit to amend the California Constitution to decree that "[t]he state shall not . . . grant preferential treatment . . . on the basis of race, sex, color, ethnicity, or national origin in . . . public contracting." (Cal. Const., art. I, § 31, subd. (a).) SMUD acknowledges that its preferential treatment policy runs afoul of this constitutional proscription unless it falls within an exception for "action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the State." (Cal. Const., art. I, § 31, subd. (e).)

We are required to apply the language of the Constitution according to its terms. That task, in my view, is a simple one and is not advanced by the labored analysis proposed by appellants or the creative constitutional commentary offered by our dissenting colleague.

---

[11] We do not question the validity of the disparity studies. Indeed, for the purpose of this appeal, we accept them for what they purport to be: justifications for race-based affirmative action for the purpose of complying with *Croson*. Nothing more. They make no attempt to evaluate the ability of SMUD to maintain federal funding using only race-neutral remedies.

As the dissent acknowledges, eligibility for federal programs is determined, in the first instance, by the concerned federal program agency. A challenge to eligibility is ultimately resolved in federal court. Neither we nor any other state court has authority to determine eligibility for a federal program. Consequently, our views on the Byzantine language of federal administrative regulations are of little moment. The pivotal issue is one of fact: Will termination of SMUD's race-preference policy result in a loss of eligibility for the affected federal program and a consequential loss of federal funds? The resolution of this issue requires information on actions taken by federal administrative and judicial bodies affecting SMUD eligibility.

Appellants have not offered a shred of evidence that termination of SMUD's race-preference policy will result in a loss of eligibility for a single federal program or a single federal dollar—no evidence, for example, of threats to terminate from federal enforcement officials, no citation to even a single instance where a federal agency has determined an entity ineligible based on a failure to implement racial preferences. Given this evidentiary vacuum, no matter our views on the wisdom of preferential policies, we have little choice but to abide by California's Constitution and invalidate the SMUD policy, which SMUD admits is otherwise unconstitutional.

The dissent proposes a clever workaround to bridge this evidentiary gap with respect to federal Department of Transportation programs. The dissent's argument proceeds thusly: SMUD has made findings of past discrimination based on statistical disparities in the award of contracts. Department of Transportation regulations, promulgated pursuant to title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), require race-conscious affirmative action to redress past discrimination and race-neutral affirmative action to assure that no person is excluded on account of race, color, or national origin. The Department of Transportation has "impliedly" found that SMUD's preference policy complies with department regulations; it has never informed SMUD that it was out of compliance or that the SMUD policy was unnecessary. Here the dissent takes a sudden, hazardous turn. "Because the regulations require race-conscious programs in some instances [citation], enjoining such a program effectively prohibits what is required by federal regulation." (Dis. opn., *post*, at p. 318.) Therefore, the dissent concludes, the trial court order, which we affirm, violates the supremacy clause of the United States Constitution. (U.S. Const., art. VI, cl. 2.)

Clever though it may seem, the dissent's analysis should be rejected. First, as the majority opinion notes, it comes too late. The parties never raised the issue of preemption in their papers or at oral argument. Moreover, it is otherwise fatally flawed.

While acknowledging that only the Secretary of Transportation has authority, in the first instance, to determine whether SMUD is in compliance with Department of Transportation regulations, the dissent undertakes its own dubious interpretation of Department of Transportation regulations.[1] It then ascribes this interpretation to the Secretary of Transportation based on the secretary's silence. Because the secretary "impliedly" approved SMUD's racial preference policy and because the secretary never informed SMUD the policy was unnecessary, the dissent would have us conclude that termination of the policy would lead to loss of eligibility for federal funding. This Cassandra-like forecast simply is not plausible. There is no reason to believe and certainly no evidence in the record to suggest that the dissent's views are shared by the secretary, whose views are the only ones that count.

The dissent, however, does offer SMUD a guide to constructing a viable race-conscious policy for awarding contracts where federal funding is involved: It must seek a definitive edict from the appropriate federal program agency that such a policy of racial preference is required in order to maintain eligibility for the affected program. The effect of section 31, subdivision (e) of article I of the California Constitution is to vest in federal bureaucrats, subject to federal judicial review, the authority to determine the validity of California racial preferences. Because SMUD has provided no evidence of such an edict in the present case, it cannot prevail.

I therefore respectfully concur in the majority opinion.

**BLEASE, Acting P. J., Dissenting.**—The majority affirms the trial court's injunction, which prohibits the Sacramento Municipal Utility District (SMUD) from carrying out its race conscious "Equal Business Opportunity Program" (EBOP), as required by federal regulations. (49 C.F.R. § 21.5(b)(7) (2004).)[1] In so doing, it has violated the supremacy clause of the United States Constitution and article 1, section 31, subdivision (e) of the California Constitution (§ 31).

---

[1] According to the dissent, the term "affirmative action" may have different meanings within the same section depending on context. While I concede the point as an abstraction, it is difficult to imagine a real-life circumstance where that is so; clearly, the Department of Transportation regulation is not one. This is not a case where the regulatory language is so clear that it admits of only one plausible construction so no reasonable mind could doubt that termination of SMUD's preferential policy will bring SMUD into conflict with the regulation. Even accepting the plausibility of the dissent's reading of the regulation, there are other plausible constructions that would not compel race preferences.

[1] All further section or part references are to 49 Code of Federal Regulations part 21 unless otherwise specified.

SMUD is the recipient of federal funds from the Department of Transportation (DOT). To qualify for such funds a recipient is mandated by regulation to *"take affirmative action* to remove or overcome the effects of the prior discriminatory practice or usage." (§ 21.5(b)(7), italics added.)[2] SMUD has done so by filing compliance reports, as required by the federal regulation. (§ 21.9(b) (2004).)[3] The Secretary of Transportation (Secretary) is required to determine whether SMUD is in compliance with the regulation and impliedly has done so. (§ 21.11(a) (2004).)[4]

The federal regulations provide a procedure by which "[a]ny person who believes himself . . . to be subjected to discrimination prohibited by this part may . . . file with the Secretary a written complaint" which may result in the suspension or termination of federal assistance. (Respectively, §§ 21.11(b), 21.13(a) (2004).) Plaintiff has not availed itself of this procedure. Nonetheless, the effect of the trial court's injunction places SMUD in jeopardy of loss of its federal assistance without compliance with the federal regulatory procedure.

The majority rejects the implied findings of the Secretary. Notwithstanding that the DOT is statutorily authorized to promulgate regulations requiring race-conscious affirmative action programs (*S.J. Groves & Sons Co. v. Fulton County* (11th Cir. 1991) 920 F.2d 752, 764–765) and that part 21.5(b)(7) "condone[s], and in some cases require[s], race-conscious regulations and/or action" (920 F.2d at pp. 764–765), the majority simply reads the term "affirmative action" to refer only to race-neutral programs.[5] The majority has simply ignored the text, syntax, and structure of the regulatory language, as well as SMUD's undisputed findings of fact.

---

[2] Part 21.5(b)(7) provides, in relevant part: "Where prior discriminatory practice or usage tends, on the grounds of race, color or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity to which this part applies, the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage."

[3] Part 21.9(b) provides, in relevant part: "Each recipient shall keep such records and submit to the Secretary timely, complete, and accurate compliance reports at such times, and in such form and containing such information, as the Secretary may determine to be necessary to enable him to ascertain whether the recipient has complied or is complying with this part." Part 21 is entitled "Nondiscrimination in Federally—assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964."

[4] Part 21.11(a) provides: "The Secretary shall from time to time review the practices of recipients to determine whether they are complying with this part."

[5] I agree with the majority's conclusion that a prior federal adjudication concluding that a race-based program is required to maintain federal funding, is not a prerequisite to the implementation of an affirmative action program under California Constitution section 31, subdivision (e).

Discussion

I

Preemption

Under the supremacy clause of the United States Constitution, federal statutes and regulations preempt conflicting state law. (U.S. Const., art. VI, § 2; see *Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 372 [147 L.Ed.2d 352, 361, 120 S.Ct. 2288].) In determining whether federal law preempts state law, the court's task is to determine congressional intent. (*English v. General Elec. Co.* (1990) 496 U.S. 72, 79 [110 L.Ed.2d 65, 74, 110 S.Ct. 2270]; *Northwest Central Pipeline Corp. v. State Corporation Commission of Kansas* (1989) 489 U.S. 493, 509 [103 L.Ed.2d 509, 527, 109 S.Ct. 1262].) That intent may be express or implied. It is implied when state law directly conflicts with federal law because compliance with federal and state regulations is impossible, i.e. when one prohibits what the other requires. (*Florida Lime & Avocado Growers, Inc. v. Paul* (1963) 373 U.S. 132, 142–143 [10 L.Ed.2d 248, 257, 83 S.Ct. 1210].)

The injunction issued by the trial court and affirmed by the majority conflicts with federal law because it prohibits what federal law requires. SMUD is a recipient of federal assistance pursuant to its contract with the DOT. As I show in part II, the DOT regulations require SMUD, as a recipient of those funds, to implement a race-based affirmative action program where prior discriminatory usage tends on the grounds of race to exclude individuals from participation in a program funded by the DOT. (§ 21.5(b)(7).) Because it is undisputed[6] that SMUD's board found there had been prior racial discrimination which was not eliminated by race-neutral affirmative action programs used in the past, part 21.5(b)(7) requires that SMUD take race-based "affirmative action to remove or overcome the effects of the prior discriminatory practice or usage." While the DOT regulations are based upon a system of voluntary compliance (§ 21.9(a) (2004)), they provide several procedural mechanisms to ensure compliance. Every application to the DOT for federal financial assistance to carry out a program must contain or be accompanied by an assurance that the program will be carried out in compliance with part 21. (§ 21.7(a) (2004).) The purpose of part 21 "is to effectuate the provisions of title VI of the Civil Rights Act of 1964 [Title VI] . . . ." (§ 21.1 (2004).) Recipients of such federal assistance must "submit to the

---

[6] This case comes to us on cross-motions for summary judgment. The parties agreed that application of California Constitution section 31, subdivision (e), to the EBOP is a question of law that may be determined from the undisputed facts. Thus, plaintiffs did not challenge the verity of SMUD's findings of fact, which were before the trial court as undisputed facts.

Secretary timely, complete, and accurate compliance reports . . . containing such information, as the Secretary may determine to be necessary to enable him to ascertain whether the recipient has complied or is complying with" part 21. (§ 21.9(b).) Recipients also are required to "have available for the Secretary racial and ethnic data showing the extent to which members of minority groups are beneficiaries of programs receiving Federal financial assistance." (§ 21.9(b).)

The Secretary is required from time to time to "review the practices of recipients to determine whether they are complying with" part 21. (§ 21.11(a).) A third party who believes he or she has been subjected to discrimination prohibited by part 21 may file a written complaint with the Secretary. (§ 21.11(b).) Upon receipt of such a complaint, the Secretary will conduct an investigation "whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with" part 21. (§ 21.11(c).)

If the Secretary determines no action is warranted, he will notify the recipient and the complainant. If the Secretary determines the recipient has failed to comply, he will inform the recipient and the matter will be resolved informally if possible. (§ 21.11(d).) If the matter cannot be resolved informally and the recipient fails or refuses to comply, the Secretary may effect compliance by suspending or terminating financial assistance after giving the recipient notice and an opportunity for a hearing, making express findings on the record of a failure to comply with a requirement of part 21, and approving the action upon those findings. (§§ 21.11(c), 21.15.) Action by the Secretary to suspend or terminate financial assistance is subject to judicial review. (§ 21.19; 42 U.S.C. § 2000d-2.)

In light of these regulatory procedures, in the absence of evidence of a ruling by the DOT that part 21.5(b)(7) does not require race-based affirmative action programs or a finding that SMUD's EBOP is out of compliance with part 21 (or a ruling by a federal court that SMUD's EBOP is unconstitutional), the majority stands in conflict with part 21.5(b)(7). No such evidence was presented. Moreover, while it does not appear the DOT has ruled on the regulatory construction issue, the Eleventh Circuit has recognized that part 21.5(b)(7) "condone[s], and in some cases require[s], race-conscious regulations and/or action." (*S.J. Groves & Sons Co. v. Fulton County, supra,* 920 F.2d at pp. 764–765.) Nor is there anything in the record to show plaintiffs filed a discrimination complaint with the

Secretary that triggered an investigation or that the Secretary independently conducted an investigation and determined that SMUD's EBOP fails to comply with the regulations. Because the regulations require race-conscious programs in some instances (*ibid.*), enjoining such a program effectively prohibits what is required by federal regulation.

As noted, this court does not have the authority to prohibit what federal law requires. (*Florida Lime & Avocado Growers, Inc. v. Paul, supra,* 373 U.S. at pp. 142–143 [10 L.Ed.2d at p. 257].) Nor does it have the authority to determine whether SMUD is in compliance with the DOT regulations and then terminate SMUD's federal assistance if it fails or refuses to comply with those regulations. Only the Secretary has the authority to make those determinations, subject to federal judicial review. (§§ 21.13, 21.19 (2004).) Nevertheless, the majority accomplishes indirectly what it could not do directly. By prohibiting SMUD from taking action that may result in the loss of federal funding, the majority has infringed on the exclusive jurisdiction of the Secretary to determine whether SMUD is out of compliance with the regulations and has placed SMUD in the untenable position of having to refuse to comply with regulations that require it to enforce its EBOP. SMUD will now be caught between a state court injunction prohibiting it from enforcing its EBOP and a possible directive from the Secretary ordering it to take race-based affirmative action or lose its funding.

Section 31, subdivision (e) does not require such an absurd result. It provides that "[n]othing in this section shall be interpreted as prohibiting action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the State." This exception recognizes the primacy of federal law and the importance of maintaining eligibility for federal funds. (See Ballot Pamp., Gen. Elec. (Nov. 5, 1996) analysis of Prop. 209 by Legislative Analyst) ["The measure provides exceptions to the ban on preferential treatment when necessary . . . [¶] [t]o keep the state or local governments eligible to receive money from the federal government."].) By affirming the injunction issued by the trial court, the majority opinion does just what subdivision (e) was designed to avoid.

By its terms, the operation of subdivision (e) depends on the requirements of federal law. Therefore, a plaintiff who believes he is aggrieved by a race-based affirmative action program and seeks termination of that program must look first to the federal agency under which the affirmative action program is taken. Plaintiffs have not done so despite the fact the regulatory

system provides an administrative procedure for a third party complaint. (§ 21.11(b).) Nor does this approach give SMUD unfettered discretion to interpret the regulations as it sees fit. SMUD is subject to a plaintiff's lawsuit for compensatory relief under Title VI and the Fourteenth Amendment (42 U.S.C. § 2000d-7; see *Alexander v. Choate* (1985) 469 U.S. 287, 293–294 [83 L.Ed.2d 661, 667, 105 S.Ct. 712]; *Guardians Ass'n v. Civil Serv. Comm'n* (1983) 463 U.S. 582, 607, fn. 27 [77 L.Ed.2d 866, 885, 103 S.Ct. 3221].) As noted, it is also subject to ongoing review by the Secretary for compliance with the antidiscrimination requirements of part 21. (§§ 21.11, 21.13.)

Accordingly, under the circumstances of this case, a court of this state cannot grant injunctive relief that prohibits enforcement of a race-based affirmative action program taken to maintain eligibility for a federal program, where ineligibility would result in a loss of federal funds, in the absence of a ruling by a federal agency or court that the regulations do not require the program.

II

Race-based Affirmative Action

The majority holds that SMUD's affirmative action program violates section 31 barring the giving of preferential treatment "on the basis of race . . . ." It concludes the program does not come within the exception of subdivision (e), for actions that "must be taken to establish or maintain eligibility for any federal program . . . ."

At issue are the requirements of the regulations promulgated by the federal DOT, adopted in compliance with Title VI, that requires that SMUD "*must take affirmative action* to remove or overcome the effects of the prior discriminatory practice or usage" in order to maintain eligibility for the receipt of federal funds. (§ 21.5(b)(7), italics added.)

The relevant DOT regulations are found at part 21.5.[7]

---

[7] Title VI applies to "any program or activity receiving Federal financial assistance." (42 U.S.C. § 2000d; *Bd. of Public Instruction v. Finch* (1969 5th Cir.) 414 F.2d 1068, 1070, fn. 1.) The term "program or activity" is defined broadly to include "all of the operations of [¶] (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or [¶] (B) the entity of such State or local government that distributes such assistance . . . ." (42 U.S.C. § 2000d-4a, subd. (1)(A) & (B).) This definition was adopted by the DOT in 2003 when it amended its regulations. (§ 21.23(e) (2004).)

Because the plain language of the statute defines "program or activity" to include all the operations of the state or local governmental entity (*D.J. Miller & Associates, Inc. v. Ohio Department of Admin. Services* (S.D. Ohio 2000) 115 F.Supp.2d 872, 878), if any part of an

"(a) General. No person in the United States shall, on the grounds of race, color, or national origin be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under, any program to which this part applies.

"(b) . . . [¶] . . . [¶]

"(7) This part does not prohibit the consideration of race, color, or national origin if the purpose and effect are to remove or overcome the consequences of practices or impediments which have restricted the availability of, or participation in, the program or activity receiving Federal financial assistance, on the grounds of race, color, or national origin. Where prior discriminatory practice or usage tends on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity to which this part applies, the applicant or recipient *must take affirmative action* to remove or overcome the effects of the prior discriminatory practice or usage. Even in the absence of prior discriminatory practice or usage, a recipient in administering a program or activity to which this part applies, is expected to take affirmative action to assure that no person is excluded from participation in or denied the benefits of the program or activity on the grounds of race, color, or national origin." (§ 21.5, italics added.)

Part 21.5(a) states the general prohibition against discrimination on the grounds of race, while part 21.5(b)(7) states an exception to the prohibition. Part 21.5(b)(7) is composed of three sentences, each of which must be given meaning.

The first sentence states the general exception to race-based considerations, the second sentence states the predicate condition under which affirmative action *must* be taken and the third sentence states the predicate condition under which affirmative action *may* be taken.

The regulations do not define the phrase "affirmative action." However, as noted, the DOT is statutorily authorized to promulgate regulations requiring

---

entity listed in the definition of "program or activity" receives federal funds, the entire entity is covered by Title VI, and must comply with its provisions. (*Ibid.*; *Grimes v. Superior Home Health Care* (M.D. Tenn. 1996) 929 F.Supp. 1088, 1091–1092.)

Therefore, as a recipient of federal assistance under its agreement with the DOT, all of SMUD'S operations, including those which are not directly funded by federal funds, are subject to Title VI. (*Grimes v. Superior Home Health Care, supra,* 929 F.Supp. at pp. 1091–1092.) We may therefore limit our analysis solely to the regulations promulgated by the DOT.

race-conscious affirmative action programs (*S.J. Groves & Sons Co. v. Fulton County, supra,* 920 F.2d at pp. 764–765) and part 21.5(b)(7) has been recognized to "condone, and in some cases require, race-conscious regulations and/or action." (920 F.2d at pp. 764–765.) We must also assume, in light of the Secretary's duty to review SMUD's practices (§ 21.11(a)), that the DOT is aware SMUD is enforcing a race-conscious affirmative action program. Nevertheless, there is no evidence to suggest the Secretary has found SMUD to be out of compliance with the antidiscrimination regulations of part 21.

We now turn to the regulatory language, following the basic principle of construction that where regulatory terms are not given a specific definition, they are to be interpreted according to their commonly understood definitions, while also considering the context in which the term is used. (*Colorado Dept. of Labor & Employment v. U.S. Dept. of Labor* (10th Cir. 1989) 875 F.2d 791, 797.)

Under this principle, the term "affirmative action," as used in part 21.5(b)(7), extends to race-conscious classifications. While the term may include the use of race-neutral programs (see *City of Richmond v. J.A. Croson Co* (1989) 488 U.S. 469, 507 and 509 [102 L.Ed.2d 854, 890–892, 109 S.Ct. 706] (*Croson*)), it is commonly understood to mean and may even be considered a commonly understood code for governmental programs that include minority-conscious preferences. (See *Kidd v. State of California* (1998) 62 Cal.App.4th 386, 392 [72 Cal.Rptr.2d 758] [defining term "affirmative action" as a preference for certain persons].)

However, even if the term includes race-neutral programs, the context in which the term is used in the regulation indicates it is used to include race-based action. The parallel structure and use of the same terms in both the prohibitory and defeasing provisions suggest the affirmative action required by part 21.5(b)(7) is that which is otherwise prohibited in part 21.5(a), namely affirmative action that considers race for the stated purpose of removing or overcoming the consequences of past race-based discrimination.

The text within the defeasing provisions also supports this conclusion. The first sentence, which states that "[t]his part does not prohibit the consideration of race . . . if the purpose and effect are to remove or overcome the consequences [of past discrimination based on] race," is immediately followed by the second sentence requiring that "the applicant or recipient must take affirmative action to remove or overcome the effects of the prior [race-based] discriminatory practice or usage." (§ 21.5(b)(7).) The use of the term "affirmative action" in the second sentence is clearly a reference to the race-based considerations authorized in the first sentence.

Consideration must also be given to the rule of construction that requires this court to give meaning to each word and clause in a regulation. (*Spacek v. Maritime Ass'n.* (5th Cir. 1998) 134 F.3d 283, 289.) The regulatory requirement of affirmative action stated in the second sentence is conditioned on prior race-based discrimination. Race-conscious affirmative action is permissible under the Fourteenth Amendment only upon a finding of past racial discrimination. (*Croson, supra*, 488 U.S. at p. 509.) Race-neutral programs do not implicate either the constitutional or the regulatory proscription against racial discrimination. (*Ibid.*; § 21.5(a).) If the term "affirmative action" in part 21.5(b)(7) referred only to race-neutral remedies, the second sentence would be rendered superfluous.

Moreover, the third sentence of part 21.5(b)(7) states that "[e]ven in the absence of prior discriminatory practice or usage, a recipient . . . is expected to take affirmative action to assure that no person is excluded from participation in or denied the benefits of the program . . . *on the grounds of race* . . . ." (Italics added.) This directive is aimed at rectifying present forms of discrimination and does so by requiring that no person be excluded on the grounds of race.

Construing the regulation consistent with the constitution, the term "affirmative action" in the third sentence must refer to race-neutral action. (*Croson, supra*, 488 U.S. at p. 509 [in the absence of evidence of past discrimination, race-neutral devices may be used to increase accessibility of contracting opportunities to small entrepreneurs of all races].)

Thus, the term "affirmative action" in the defeasing provisions of part 21.5(b)(7) is used to refer to both race-based and race-neutral programs, distinguishing the form of affirmative action by predicating race-based action on *past* discrimination and race-neutral action on *present* discrimination. If both directives referred to race-neutral programs, there would be no reason for the regulation to provide different treatment for past and present discriminatory practices. By construing the term "affirmative action" to mean race-based action when preceded by prior racial discrimination, we give meaning to each word and phrase of the regulation.

III

Sufficiency of the Evidence

Although the majority concludes that it need not determine whether the statistical disparities found in SMUD's studies were sufficient to show past discrimination, it nevertheless concludes those studies were inadequate.

The adequacy of those studies is not properly before us. This case comes to us on cross-motions for summary judgment in which the parties stipulated to the undisputed facts. Those facts included SMUD's findings of prior racial discrimination and that race-neutral affirmative action programs were ineffective to overcome the effects of past racial discrimination. As a result, the adequacy of the disparity studies underlying those findings is not at issue. In this procedural posture, a challenge to the sufficiency of the evidence is limited to a challenge of SMUD's findings of fact and a determination of the legal question whether those findings are sufficient to satisfy the regulatory requirements. As we show, they are sufficient.

Nevertheless, in the majority's view, the studies are inadequate because they (1) fail to cite a federal regulation requiring race-based remedies, (2) fail to identify the federal law defining the standard for a factual predicate and (3) fail to establish that race-neutral alternatives are not viable alternatives.

First, the majority concludes the disparity studies failed to cite to a federal regulation or identify a standard for a factual predicate of prior race-based discrimination. The majority fails to cite any authority that requires the presence of any such citation in the study and I fail to see how the absence of a legal citation undermines the sufficiency of the evidentiary findings themselves.

As discussed *ante*, the regulations require prior race-based discrimination as a factual predicate to a race-based affirmative action program (§ 21.5(b)(7)) and as I show, SMUD made findings of fact sufficient to satisfy the factual predicate.

The undisputed evidence satisfies the requirements of part 21.5(b)(7). SMUD conducted two disparity studies, one in 1993 and another in 1998. SMUD accepted the findings in the 1993 study and found that its outreach and other race-neutral programs had failed to increase participation sufficiently by minority business enterprises (MBE's) in SMUD's contracting process.

The SMUD board therefore concluded race-conscious remedial action was required to remedy past discrimination against the groups identified in the study. Based upon the results of the 1993 study, SMUD implemented its EBOP, which set race-conscious goals for utilization of MBE's and monitored the program from its inception.

In 1998, SMUD commissioned an updated study. After a public comment process, the Board accepted the updated results of the 1998 disparity study. In so doing, the board found "significant disparity exists in the District's utilization of [MBE's] when compared to the number of available qualified

[MBE's], with respect to dollar expenditure participation in the areas identified. . . . the statistical and anecdotal information collected for the Study provide convincing evidence that the results cannot be attributed to chance. . . . the statistical and anecdotal evidence combined provide the factual basis necessary to establish an inference that there has been disadvantage suffered by minority . . . contractors and, therefore, the District has a compelling governmental interest in remediating that disadvantage. . . . the District has had an outreach and other race-neutral programs, some of which have been incorporated in the EBOP, in operation since 1990, designed to increase minority and women contracting opportunities, yet the statistics and anecdotal evidence set forth in the Study indicate that these programs, by themselves, have not sufficiently increased participation by minority and women business enterprises in the District's contracting process to eliminate significant disparity in all areas." Upon these findings, the Board authorized SMUD's General Manager to revise the EBOP. That program currently includes "participation goals," in some cases, "evaluation credits," outreach and informational assistance, and a good faith exception for contractors who have not met the subcontracting participation goals.

This evidence establishes that SMUD's prior discriminatory practices[8] have had the effect of excluding certain racial minority contractors and subcontractors from participating in their construction contract programs and that race neutral programs were ineffective to eliminate the disparity. Under the terms of part 21.5(b)(7), SMUD is required to take race-based affirmative action to remove or overcome the effects of its prior discrimination.

Since the requirement of "affirmative action" includes both race-neutral and race-conscious action, and the undisputed evidence establishes that SMUD has attempted to use race-neutral outreach and other methods and concluded in good faith that they were not sufficient to remedy the statistical underutilization reflected in the disparity studies, SMUD was left with no other alternative but to adopt a race-conscious remedial plan to eliminate the effects of its own past discriminatory practices.

---

[8] SMUD need not prove it directly discriminates against MBE's. The governmental entity need not be an active perpetrator of discrimination; passive participation satisfies strict scrutiny review. (*Coral Const. Co. v. King County* (9th Cir. 1991) 941 F.2d 910, 916.) The "[m]ere infusion of tax dollars into a discriminatory industry may be sufficient governmental involvement" to establish passive participation. (*Ibid.*; *Croson, supra*, 488 U.S. at p. 492.) Thus, it is sufficient to prove the SMUD awards prime contracts to general contractors who discriminate against MBE subcontractors.

Having determined that it engaged in a practice of past racial discrimination, SMUD is required by DOT regulations to certify its assurance that it has taken race-based affirmative action to overcome or remove the effects of that discrimination. (§ 21.5(b)(7).) It has done so by developing and implementing the EBOP, a plan whose purpose is to remedy the disadvantages suffered by the identified race-based groups of contractors and subcontractors.

I would reverse the judgment with directions to vacate the injunction.

A petition for a rehearing was denied October 13, 2004, and appellants' petition for review by the Supreme Court was denied December 15, 2004. Werdegar, J., and Moreno, J., were of the opinion that the petition should be granted.